**In re RAVICK CORPORATION, Debtor.**

**Bankruptcy No. 88–08017.**

United States Bankruptcy Court,
D. New Jersey.

Aug. 30, 1989.

John W. Hargrave, Voorhees, N.J., for debtor.

Lampf, Lipkind, Prupis & Petigrow by Scott D. Jacobson, West Orange, N.J., for Gary Prisand, Mt. Laurel Development Associates and Union Mill Farms Associates.

Markowitz & Zindler by Michael A. Zindler, for Mainstay Federal Sav. and Loan Assn.

## OPINION

ROSEMARY GAMBARDELLA, Bankruptcy Judge.

The matter before the court is a motion, filed on April 10, 1989 by Gary Prisand ("Prisand"), Mt. Laurel Development Associates ("MLDA") and Union Mill Farms Associates ("UMFA") (hereinafter referred to collectively, where appropriate, as "Prisand"), (1) for dismissal of Ravick Corporation's (the "debtor") Chapter 11 bankruptcy case pursuant to 11 U.S.C. § 1112(b), (2) for this court to abstain from exercising its jurisdiction over a certain adversary proceeding before it entitled *Ravick Corporation v. Gary Prisand, Mt. Laurel Development Associates, and Union Mill Farms Associates,* Adversary No. 88–1089, pursuant to 28 U.S.C. § 1334(c)(1) and (2) for modification of the automatic stay pursuant to 11 U.S.C. § 362(d) to allow the continuation of an action entitled *Gary Prisand et al. v. Ravick Corporation and Raymond L. Girard* Docket No. C–16251–88E, in the Superior Court of New Jersey, Chancery Division, Burlington County. Because the court finds that the debtor's Chapter 11 bankruptcy case was not filed in good faith within the meaning of § 1112(b), and that "cause" exists for dismissal of the petition, the debtor's Chapter 11 case is hereby dismissed. The relevant facts of this matter follow.[1]

In 1968 Raymond L. Girard purchased 104.158 acres of undeveloped land (hereinafter the "Property"), zoned R–3 residential, described as Lots 1 and 2, Block 278 on the tax map of Mt. Laurel Township, located on Union Mill Road, Mt. Laurel Township, Burlington County, at a cost of $2,000.00 per acre (Deposition Transcript of January 13, 1989 of Raymond L. Girard at pp. 22, 36–37, 62) (hereinafter "Girard Dep. at ——"). Girard apparently contributed the Property to the Ravick Corporation in consideration for his receipt of the debtor's common stock (Girard Dep. at 63). Girard is presently the sole shareholder, officer and employee of the Ravick Corporation (Girard Dep. at 8). In July 1983 Ravick Corporation applied to the Planning Board of Mt. Laurel Township to subdivide and develop 512 dwelling units ("The Project") on the Property (Affidavit of Girard dated August 22, 1988 at ¶ 3) (hereinafter Girard Affidavit #1 at ——). On May 9, 1985, Ravick received preliminary plat approval for Phase I of the subdivision, Phase 1 consisting of 50 single family units (Girard Affidavit #1 at ¶ 6).

In 1983 the New Jersey Supreme Court issued the landmark decision of *Southern Burlington County N.A.A.C.P. v. Township of Mount Laurel,* 92 N.J. 158, 456 A.2d 390 (1983), which decision obligated municipalities to provide low and moderate income housing through the mechanism of

1. The court notes that its findings involve in part consideration of affidavits. The court in *In re Apex Properties, Ltd.,* Civil Action No. 88–0056 (D.N.J., May 6, 1988) noted:

It is axiomatic that affidavits constitute proper evidence on motions. Fed.R.Civ.P. Rule 43(e). More specifically, a court may rely upon affidavits on a motion to dismiss. *See Young v. Garrett,* 149 F.2d 223, 225 n. 1 (8th Cir.1945); *Lucking v. Delano,* 129 F.2d 283, 285 (6th Cir.1942); *Central Mexico Light & Power Co. v. Munch,* 116 F.2d 85, 87 (2nd Cir.1940); *American Ins. Co. v. Bradley Mining Co.,* 57 F.Supp. 545, 547 (N.D.Cal.1944)). Op. at p. 9. Fed.R.Civ.P. Rule 43(e) is made applicable to cases under the Bankruptcy Code by Bankruptcy Rule 9017.

land use regulations. Ravick Corporation was made a party to a multi-party litigation in the Superior Court of New Jersey, Atlantic County involving Mt. Laurel Township. The final consent order, issued by The Honorable L. Anthony Gibson on September 12, 1985 directed Mt. Laurel Township to permit Ravick to construct up to 512 dwelling units on the Property and required the developer to reserve 15% of the units to low and moderate income housing.

By way of resolution dated September 26, 1985, the Mt. Laurel Township Planning Board granted to the debtor final approval for development of 50 single family homes on the Property. On October 10, 1985, the Planning Board granted preliminary approval for Phase II (the remainder of the single family detached units) and Phase III (the townhouse units) of the development project (hereinafter referred to collectively as the "Project"). The Planning Board expressly conditioned preliminary approval of Phases II and III on, *inter alia,* Ravick's procuring a valid and current stream encroachment permit from the New Jersey Department of Environmental Protection ("DEP"). The preliminary approval, however, did not require approval by the United States Army Corps of Engineers ("Army Corps").

According to the Honorable Harold B. Wells, III's letter opinion dated October 18, 1988 (hereinafter "Letter Opinion") in the state court matter of *Prisand v. Ravick,* C–16251–88E, granting Prisand's motion for partial summary judgment for specific performance of the contract, *see infra,* Ravick Corp. received preliminary approval for an R–3 single family development of 141 units in 1978. As one of the conditions of preliminary approval, Ravick was required to procure a stream encroachment permit from DEP, which the seller did without applying to the United States Army Corps of Engineers. That plan, however, was never implemented and the permit expired (*See* Letter Opinion, p. 2).

Ravick contends that in November 1985, it made application to DEP for a stream encroachment permit (Girard Affidavit # 1

at ¶ 11). On March 20, 1986, the debtor's engineers received a letter from the DEP, Division of Water Resources, which stated:

> It has been determined that your submission of a revised project delineation on U.S.G.S. scale dated March 14, 1986 accurately represents the project site as shown on the site plan. *This delineation indicates that the project borders but does not contain any wetlands, based on U.S. Fish and Wildlife Service's National Wetlands Inventory maps.* (Emphasis added in Affidavit).

(Girard Affidavit at ¶ 12; *See also* Letter Opinion at p. 3).

On September 15, 1986 Ravick Corporation and Raymond Girard entered into a written Contract of Sale ("Contract") with Gary M. Prisand for the purchase of the Property by Prisand. The Contract covered 510 fully improved lots and townhouse units which are part of the subdivision known as Union Mills Farms (Agreement at ¶ 1). MLDA is a New Jersey partnership which is the assignee of Gary Prisand's rights under the Contract (*See* Verified Complaint entitled *Gary Prisand, Mt. Laurel Development Associates and Union Mill Farms Associates, L.P. v. Ravick Corporation and Raymond L. Girard* at ¶ 2, filed in the Superior Court of New Jersey, Chancery Division, Burlington County, Docket No. C–162–21–88E) (hereinafter "State Court Complaint"). UMFA is a New Jersey partnership and is an assignee of certain of MLDA's interests in the Contract of Sale and is developing the Property. (*See* State Complaint at ¶ 3).

Paragraph 2 of the Contract sets forth the purchase price and states that Prisand would pay $21,208.23 for each lot and unit. Paragraph 4.1 of the Contract states in relevant part that "the purchase price of $21,208.23 per lot or unit is to be allocated $11,568.23 for the land and governmental approvals and $9,640.00 for the improvements to be made with respect to each lot and unit by [Ravick Corporation]."

Pursuant to Paragraph 3 of the Contract, the parties scheduled seven closings to consummate the transaction. Paragraph 3 states in relevant part:

3.1 Subject to the fulfillment of all the conditions of this Agreement by the Seller [Debtor], the initial closing shall occur on or before October 15, 1986, at which closing forty-eight (48) single-family lots shall be purchased. The Purchaser [Prisand] shall also reimburse the Seller the amount of Seventy–Two Thousand ($72,-000.00) Dollars for forty-eight (48) sewer connection permits for such lots.

3.2 After the initial closing, closings shall occur in accordance with the following schedule, at which time the Purchaser [Prisand] shall purchase the following lots and units:

| | Lots & Units | |
|---|---|---|
| (a) | February 15, 1987 | 100 |
| (b) | August 15, 1987 | 75 |
| (c) | February 15, 1988 | 73 |
| (d) | August 15, 1988 | 73 |
| (e) | February 15, 1989 | 73 |
| (f) | May 15, 1989 | 68 |

Paragraph 9 of the Contract sets forth the seller's representations and covenants wherein the debtor and Girard warranted and represented to Prisand that: (a) the Subject Property was zoned and improved for construction of 510 residential units, consisting of 238 single-family detached units and 272 single-family attached townhouse units; and (b) the debtor and Girard would obtain all of the necessary and non-appealable governmental approvals for The Project by the initial closing. Paragraph 9 of the Contract states in pertinent part:

9. *Representations and Covenants of Seller*

Seller represents and warrants to and covenants with, Purchaser [Prisand], knowing and intending that Purchaser [Prisand] shall rely thereon, and which representations and covenants shall survive each and all closing as follows:

9.1 The Premises conform to existing zoning and site plan approval which allow for the construction of a residential development consisting of two hundred thirty-eight (238) single family detached units and two hundred seventy-two (272) single family attached townhouse unts. The five hundred ten approved lots and units are subject to a fifteen (15%) percent allocation for low and moderate

housing in accordance with the final consent order of the Superior Court of New Jersey which provides that such allocation may be satisfied entirely in townhouse units and shall be satisfied by the construction of not more than thirty-eight (38) one bedroom townhouse units not less than twelve (12) three bedroom townhouse units which are allocated to low and moderate housing.

9.3 Seller represents that it has or will have by the initial closing all necessary final non-appealable government approvals required for the development of the premises for two hundred thirty-eight (238) single family detached units and two hundred seventy-two (272) single family attached townhouse units, including but not limited to all final non-appealable approvals from the Department of Environmental Protection, the municipal utility authority, stream encroachment permits, sewer and water approvals, and as to each closing, there is adequate sewer and water capacity to service the lots and units which are then being closed.

According to Judge Harold B. Wells' Letter Opinion dated October 18, 1988, the only permit Ravick was waiting for at the time the Contract was executed was the stream encroachment permit from the DEP. (Letter Opinion at p. 4). The debtor, however, contends herein as it did before the state court that it was unaware, before November 26, 1986, that Army Corps approval was required for the issuance of the permit. (Girard Affidavit # 1 at ¶ 14).

On November 26, 1986 the DEP issued a stream encroachment permit to the debtor (the "Permit"), effective December 19, 1986, with an expiration date of November 19, 1988. The Permit expressly required the debtor and Girard to obtain approvals from the United States Army Corps of Engineers. The permit states in relevant part:

This permit DOES NOT GIVE ANY PROPERTY RIGHTS in either real or personal property, nor any exclusive privileges; neither does it authorize any injury to private property; nor invasion of private rights; nor any infringement

of Federal, State or local laws or regulations; nor does it waive the obtaining of Federal or other State or local government consent when necessary. THIS PERMIT IS NOT VALID AND NO WORK SHALL BE UNDERTAKEN UNTIL SUCH TIME AS ALL OTHER REQUIRED APPROVALS AND PERMITS HAVE BEEN OBTAINED INCLUDING BUT NOT LIMITED TO PERMITS AND APPROVALS FROM THE FOLLOWING:

U.S. Army Corps of Engineers (Philadelphia District). (Permit at ¶ 8, emphasis in original).

The debtor contends herein, as it did before the state court, that the requirement of Army Corps approval was a complete reversal of DEP's original position as stated in the March 20, 1986 letter that the Property did not contain wetlands. According to Judge Wells' Letter Opinion, Ravick Corporation embarked upon a fourteen month struggle with the Army Corps, following issuance of the Permit, over the subject (Letter Opinion at p. 5).

In the interim, on February 26, 1987, the Debtor, Mr. Girard and Mr. Prisand held the Initial Closing for the forty-eight (48) single family lots constituting Phase I of the Project. Mr. Prisand paid directly to the Seller $1,089,995.04 and paid in escrow $160,024.00 for unfinished site improvements. (Letter to Gary Prisand from Raymond Girard dated February 6, 1987 entitled "Settlement—Section No. 1, Union Mill Farms, Mt. Laurel, New Jersey").

Also on February 26, 1987, Girard executed a "Certification" on his own behalf and as President of Ravick Corporation wherein he reaffirmed the warranties in Paragraph 9 of the Contract (see supra). In particular, the certification provided in relevant part that:

The initial closing under the Contract is being held this date. In accordance with Section 12.4 of the Agreement, the Seller hereby certifies to the Assignee as follows:

1. All representations and warranties of the Seller in the Contract are true and correct and in all respects on and as of the date hereof as though made as of the date hereof.

By way of letter dated February 9, 1988, about one year after the initial closing, the Army Corps informed the debtor that 18.57 acres of the Property were wetlands.

By way of letter dated March 7, 1988, Ravick Corporation and Girard informed Prisand of the new wetlands determination and that the previously approved preliminary subdivision would have to be resubmitted for approval. The debtor further informed Prisand that it was increasing the contract price for improved lots from $21,208.23 to $26,280.00. The March 7, 1988 correspondence provided in relevant part:

The enclosed Preliminary Plan of Union Mill Farms in Mt. Laurel Township, revised to January 12, 1988, shows the lands confiscated by the U.S. Government and labeled as "Limits of Federal Jurisdiction". These lands comprise 18.57 acres. This revised Preliminary Plan further shows the revised townhouse and single family units. The revised plans together with the engineering details are again being submitted to Mt. Laurel Township.

On September 15, 1986 Ravick Corporation entered into a Contract of Sale with Gary M. Prisand. This Contract of Sale was based on the aggregate of five hundred ten (510) improved lots and townhouse units as described on the Preliminary Plan of Union Mill Farms dated March 13, 1984 and revised to February 4, 1986. This Preliminary Plan no longer exists.

The purpose of this correspondence is to advise you that the purchase price for the improved lots and units shall be $26,280 per lot and unit.

In order for Ravick Corporation to proceed with the final approval process, it will be necessary for you to inform Ravick by March 16, 1988 of your interest in the Union Mill Farms Project.

By way of a statement dated March 28, 1988, the Debtor indicated that the revised unit price of $26,280 was premised on the ability to deliver 428 units as follows:

UNION MILL FARMS

| Units Available— | |
|---|---|
| Based on Revised Preliminary Plan | 428 Units |
| Price Per unit—Improved (Excluding Sidewalks) | $26,280/Unit |

SCHEDULE OF PAYMENTS

| 1. Preliminary Approvals Payment due at signing of Contract. | $ 6,000/Unit. |
|---|---|
| 2. Land & Final Approvals | $14,780/Unit |
| 3. Improvements | $ 5,800/Unit |

The above per unit prices are based on a total of 428 units in Union Mill Farms. If the final plans reflect less than 428 units, the price per unit will be adjusted accordingly.

By way of letter dated April 4, 1988, Raymond Girard advised Prisand that Ravick Corporation and Girard considered the Contract between Ravick Corporation and Prisand, dated September 15, 1986, to be void. In response, by way of letter dated April 7, 1988, Prisand notified the debtor that Prisand considered the Contract to remain in full force and effect.

On May 24, 1988, Prisand, MLDA and UMFA filed a verified complaint and order to show cause seeking *inter alia* specific performance of the contract in the Superior Court of New Jersey, Chancery Division, Burlington County, Docket Number C–16251–88E. (*see supra*). Thereafter, the debtor and Girard made a revised application to the Mt. Laurel Township Planning Board for preliminary approval of Phases II and III and hearings were held on May 26, 1988 and June 9, 1988. By reason of the delineation of wetlands by the Army Corps, the number of units covered under the Project was reduced as follows: 190 single family units reduced to 160 units, and 272 townhouses reduced to 177. (Letter Opinion at p. 5). The Planning Board resolution granting preliminary approval was adopted on June 23, 1988.

By way of letter dated June 10, 1988, the Debtor and Mr. Girard indicated to Prisand, MLDA and UMFA, through respective counsel, their ability to deliver units, at a higher price of $34,000.00 per unit. That correspondence states in pertinent part:

My client is willing to meet with you and your clients to negotiate a revised contract of sale based upon the new subdivision plan. The negotiations would be without prejudice to any party with respect to the pending lawsuit.

With regard to the purchase price, *my client is of the opinion that the Township will approve 340 units in the balance of the tract. Consequently, the price per unit is to be revised from $21,208.23 to $34,000.00.* (Emphasis Added).

On October 18, 1988 Judge Wells granted Prisand's motion for partial summary judgment for specific performance and denied the Debtor's and Mr. Girard's cross-motion for partial summary judgment excusing future performance of the Contract based on the doctrine of impossibility of performance.

Specifically, Judge Wells' opinion provides as follows:

Based on the contract it is clear that the Seller expressly assumed the risk that further necessary government approvals would not be granted. See Section 9.3 of the contract *supra* at 3. Specifically, the Seller represented and covenanted that 'it has or will have by the initial closing all necessary final non-appealable government approvals required for the development of the premises [including] ... stream encroachment permits.' The fact that the Seller did not in fact have or could not obtain all government approvals for the contracted property does not therefor entitle the Seller to excuse its performance since it was a *foreseeable risk which was expressly assumed by the Seller.* It was particularly foreseeable after November 1986 when the Seller knew that the DEP has reversed itself and was requiring Army Corps approval. Yet the Seller proceeded to close at the agreed price on the first 48 lots and reaffirmed its guaranty that all approvals were in hand or would be forthcoming.

As to the Seller's argument that the contract is not enforceable because the subdivision plan to which it referred was vacated by Mount Laurel, the fact is that the seller has offered no proof that the new subdivision, which received preliminary approval in June 1988, was substan-

tially more costly per unit that the original plan. True, the June 1988 plan approved by Mt. Laurel represents a 17.8% reduction in the acreage and a 24% drop in the number of lots, but there were not minimums set forth in the contract triggering Seller's right to raise the per unit price or an excuse for non-performance. Indeed, it is inequitable to the buyer now after it has committed over $1 million to the project, for the Seller to pull out. In addition, the Court also finds that notwithstanding the Seller's assumption of the risk in this case, the *decrease in available lots* from 510 to 385 due to the Army Corps' wetlands determination and subsequent revised plan *does not*, as a matter of law, *entitle the Seller to the defense of impossibility.*

* * * * * *

In this case, the preliminary plans for the property following small revisions contemplated 510 lots. Under the new development plan, the amount of lots has been reduced by 125 lots. The fact remains that 76% of the original amount of lots are still available for conveyance. The sale of the property has not been made impossible. This is made evident by Seller's letters which seek a higher price. The fact that the Seller may derive less on the sale does not render the contract impossible.

* * * * * *

[T]he contract of sale dated September 15, 1986 is declared enforceable and the seller is ordered to specifically perform that portion of the contract concerning the conveyancing of land and the obtaining of government approvals in exchange for the amount of $11,568.23 per lot. This transaction should occur as soon as reasonably practical. The buyer retains all rights to sue for monetary damages under the contract which it suffers as a result of the improvements it undertakes to gain final approvals.

(Letter Opinion at pp. 6–7, 10) (emphasis added). The decision of Judge Wells directing the transfer of the remaining 340 subdivided lots requires Gary Prisand to pay the Debtor approximately $3.95 million.

The decision by its terms does not compel the debtor or Mr. Girard to perform the improvements to the remaining subdivided lots, as provided under the terms of the Contract.

In accordance with Judge Wells' decision, a proposed form of order was submitted to Judge Wells under cover letter dated October 31, 1988 by Prisand. By way of letter dated November 3, 1988, the debtor objected to the form of order. On or about November 15, 1988, Ravick Corporation and Girard filed a motion for reconsideration of Judge Wells' decision. Judge Wells apparently set down both the return date on the motion for reconsideration and a hearing on settlement of the form of order for December 9, 1988.

On November 18, 1988 Raymond L. Girard, in his capacity as president of Ravick Corporation, adopted the following corporate resolution pursuant to a "special meeting" held at the offices of his attorney, John W. Hargrave:

> IT IS HEREBY RESOLVED that the President of Ravick Corporation be and he is hereby authorized to execute and file on behalf of the corporation a Petition for Relief under Chapter 11 of the United States Bankruptcy Code for the district of New Jersey.

> IT IS FURTHER RESOLVED, that John W. Hargrave, Esquire is hereby retained to act on behalf of Ravick Corporation and to represent it in connection with such proceedings.

On December 7, 1988, two days before the parties were scheduled to appear before Judge Wells in the New Jersey Superior Court, Ravick Corporation filed a voluntary Chapter 11 petition pursuant to the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984 as further amended by the Bankruptcy Judgeship, United States Trustee's and Family Farmer Act of 1986 (hereinafter "Bankruptcy Code").

On December 19, 1988, Judge Wells apparently ruled that Ravick's Chapter 11 filing did not stay the state court from

entering an order against the non-debtor Girard, consistent with its Letter Opinion. On that day, Judge Wells denied the non-debtor Girard's motion for reconsideration and directed counsel for Prisand to submit a form of order granting partial summary judgment as against the non-debtor Girard, which counsel did under cover letter dated December 20, 1988.

On December 21, 1988, the debtor filed a motion with this court seeking authorization to reject the Contract entered into between the debtor and Prisand as an "executory contract" pursuant to 11 U.S.C. § 365(a)[2].

On December 21, 1988 the debtor filed an adversary proceeding in this court entitled *Ravick Corporation v. Gary Prisand, Mt. Laurel Development Associates and Union Mill Farms Associates*, Adversary No. 88–1089, titled "Verified Complaint for Injunctive Relief and to Object to Claim." By that complaint the debtor seeks an order of this court declaring that the debtor's further performance under the Contract be excused under the doctrine of impossibility and rejecting any claim Prisand may have pursuant to 11 U.S.C. § 365. By that same complaint the debtor, Ravick, seeks an injunction against Prisand continuing the prosecution of the state court action, including any action against the non-debtor Raymond Girard, pending further order of this court.

On January 13, 1989 Prisand filed an Answer seeking dismissal with prejudice of the complaint, together with attorneys' fees and costs of suit. By its answer Prisand asserts the following separate defenses: (1) the complaint fails to state a claim upon which relief can be granted; (2) the court should abstain from accepting jurisdiction of the subject claims pursuant to 28 U.S.C. § 1334(c)(1) or (c)(2); (3) this court lacks jurisdiction over the subject matter of the complaint.

Pursuant to the aforementioned complaint the debtor on December 21, 1988 filed an application for a temporary restraining order seeking an order temporarily restraining Prisand from proceeding with entry of judgment in the state court proceeding against Raymond Girard and setting a date for hearing on the debtor's application to continue the restraints until this court has passed on the debtor's motion to reject the Contract pursuant to § 365 and the aforesaid adversary proceeding.

By way of letter dated January 4, 1989, Prisand notified this court that the parties agreed to adjourn the order to show cause without date and that the parties would engage in limited discovery. Counsel for Prisand also requested that the state court abstain from signing the proposed form of order submitted by Prisand. It appears that as of the date of the hearing on the instant matter, May 9, 1989, by agreement of counsel of Prisand and the debtor, an order as against Mr. Girard was not entered in the state court proceeding.

Prisand's position in connection with this motion to dismiss Ravick's Chapter 11 petition is that the bankruptcy petition was filed in bad faith and that other "cause" exists for dismissal of the case pursuant to § 1112(b) including the inability to effectuate a plan and unreasonable delay prejudicial to creditors or for abstention and dismissal of the case pursuant to § 305; or alternatively, that the facts of this case establish the existence of "cause" warranting the modification of the stay pursuant to § 362(d) and abstention by this court pursuant to 28 U.S.C. § 1334(c)(1) from exercising jurisdiction over the pending adversary proceeding filed by Ravick against Prisand in this court and to grant relief from the automatic stay pursuant to § 362 to permit completion of the state court action.

The debtor, on the other hand, argues that (1) the debtor's filing was done in good faith and that its ability to reorganize makes dismissal inappropriate; and (2) the

---

**2.** Title 11 U.S.C. § 365(a) provides:
(a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

interests of all parties would best be served if the bankruptcy court does not abstain pursuant to 11 U.S.C. § 305 and does not permit completion of the state court action pursuant to 28 U.S.C. § 1334(c) or grant relief from the stay pursuant to 11 U.S.C. § 362.

## DISCUSSION

 Section 1112(b) of the Bankruptcy Code states:

(b) Except as provided in subsection (c) of this section, on request of a party in interest or the United States trustee, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, including—

(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

(2) inability to effectuate a plan;

(3) unreasonable delay by the debtor that is prejudicial to creditors;

(4) failure to propose a plan under section 1121 of this title within any time fixed by the court;

(5) denial of confirmation of every proposed plan and denial of a request made for additional time for filing another plan or a modification of a plan;

(6) revocation of an order of confirmation under section 1144 of this title, and denial of confirmation of another plan or a modified plan under section 1129 of this title;

(7) inability to effectuate substantial consummation of a confirmed plan;

(8) material default by the debtor with respect to a confirmed plan;

(9) termination of a plan by reason of the occurrence of a condition specified in the plan; or

(10) nonpayment of any fees or charges required under chapter 123 of title 28.

11 U.S.C. § 1112(b). The legislative history of this section explains that:

[s]ubsection (b) gives wide discretion to the court to make an appropriate disposition of the case when a party in interest requests. The court is permitted to convert a reorganization case to a liquidation case or to dismiss the case, whichever is in the best interest of creditors and the estate, only for cause. Cause may include ... [the ten factors listed in § 1112(b)]. The list is not exhaustive. The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 405–06 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 6361, 6362. Section 1112(b) does not define the term "cause" but instead sets forth a list of non-exclusive grounds which may constitute cause. *See e.g., In re Victory Construction Co.,* 9 B.R. 549, 558–60 (Bankr.C.D.Cal.1981), *vacated on other grds,* 37 B.R. 222 (9th Cir. BAP 1989) ("cause" is any reason cognizable to the equity power and conscious of the court as constituting an abuse of the bankruptcy process). It is well established that a debtor's bad faith filing of a bankruptcy petition is sufficient "cause" to warrant dismissal of the case under § 1112(b). *See also In re Waldron,* 785 F.2d 936 (11th Cir.1986) (construing comparable sections under Chapter 13); *Matter of Little Creek Development Co.,* 779 F.2d 1068, 1072 (5th Cir.1986); *In re Albany Partners Limited,* 749 F.2d 670, 674 (11th Cir.1984); *Matter of Century City, Inc.,* 8 B.R. 25, 30 (Bankr. D.N.J.1980). Prisand contends that dismissal of Ravick's case under § 1112(b) is justified on the grounds that (1) the debtor filed its petition in bad faith; (2) the debtor cannot effectuate a reorganization plan pursuant to 11 U.S.C. § 1112(b)(2); and (3) the debtor's filing constitutes unreasonable delay prejudicial to creditors pursuant to 11 U.S.C. § 1112(b)(3). Since Ravick opposed the motion to dismiss, Prisand has the burden of proof on the issue of "cause." *See* 3 Collier Bankruptcy Manual, ¶ 1112.04 at p. 1112–17 (3d Ed.1987).

 Congress' grant of authority to the bankruptcy courts to dismiss chapter 11 petitions for "cause," and the requirement

of good faith, are intended to preserve the integrity of the bankruptcy process. *Matter of Little Creek Development Co.*, 779 F.2d 1068, 1072 (5th Cir.1986). Dismissal of a case is appropriate where a case is not filed to achieve the valid, legitimate purposes of the rehabilitate provisions of Chapter 11. *In re Randy Homes Corporation*, 86 B.R. 259, 261 (Bankr.M.D.Fla. 1988).

■ In determining whether bad faith exists, courts have focused on whether the particular circumstances of a case, viewed in their totality, evidence the debtor's intent to abuse the judicial process and the purposes of the reorganization provisions of the Code. *In re Phoenix–Piccadilly, Limited*, 849 F.2d 1393, 1394 (11th Cir. 1988); *Century City*, 8 B.R. at 33. In making such a determination, the facts and circumstances of the particular case must be examined and no one factor should be controlling. *In re Kasdorf*, 64 B.R. 294, 295 (Bankr.D.Colo.1986); *see also Matter of Grieshop*, 63 B.R. 657, 662–63 (N.D.Ind. 1986).

The case of *Little Creek, supra,* identified a "conglomerate" of factors which have been considered in determining whether a bankruptcy case was filed in bad faith. The existence of certain of the factors identified by the *Little Creek* court may be considered in a motion to dismiss for "cause" including:

> The debtor has one asset, such as a tract of undeveloped or developed real property. The secured creditors' liens encumber this tract. There are generally no employees except for the principals, little or not cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments pursuant to 11 U.S.C. §§ 361, 362(d)(1), 363(e), or 364(d)(1). Typically, there are only a few, if any, unsecured creditors whose claims are relatively small. The property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions againt the foreclosure in state court. Alternatively, the debtor and one

creditor may have proceeded to a standstill in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford. Bankruptcy offers the only possibility of forestalling loss of the property. There are sometimes allegations of wrongdoing by the debtor or its principals. The "new debtor syndrome," in which a one-asset entity has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors, exemplifies, although it does not uniquely categorize, bad faith cases.

*Id.* at 1072–73. In *Little Creek*, the Fifth Circuit emphasized that determining whether the debtor's filing is in good faith depends "largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities." *Id.* at 1072. In that case the Fifth Circuit held that the bankruptcy court's finding that "cause" existed to lift the automatic stay pursuant to 11 U.S.C. § 362(d)(1) based solely on the remarks of counsel for the debtor that the bankruptcy petition was filed in order to escape the necessity of posting a substantial bond in an ongoing state court proceeding was clearly erroneous and that more evidence was necessary to support the bankruptcy court's conclusions. *Id.* at 1070. The *Little Creek* court reversed the bankruptcy court's judgment and the district court's judgment affirming the bankruptcy court order and remanded the matter with instructions.

In remanding the matter, the *Little Creek* court noted:

> We do not, in reversing the bankruptcy court's somewhat hasty conclusion in this case, imply that a finding of lack of good faith would be improper after fuller consideration of the issue on remand. Unless facts appear in the record that clearly warrant a finding of bad faith, however, a debtor should ordinarily be given an opportunity to respond to a charge of abuse of the bankruptcy process.

From the foregoing discussion, it should be clear that a debtor may not counter allegations of bad faith solely

with an attempt to relitigate the issues presented in its state court case. If the circumstances surrounding Little Creek's filing demonstrate that the goals of the bankruptcy laws cannot be fulfilled by permitting Little Creek to stave off foreclosure by Commonwealth, then it makes no difference whether Little Creek had, or has, a cause of action for damages against Commonwealth in state court. Additionally, as the issue of good faith arose during a hearing on a motion to lift the stay, Little Creek will not be permitted to undermine the expedited treatment of this motion, *see* 11 U.S.C. § 362(e), by interpreting the state court issues. *See In re Johnson,* 756 F.2d 738, 740 (9th Cir.), *cert. denied,* [474 U.S. 828], 106 S.Ct. 88, 88 L.Ed.2d 72 (1985); *In re Born,* 10 B.R. 43, 48–50 (Bankr.S. D.Tex.1981). The bankruptcy court was correct in striking the extrinsic state law defenses from the debtor's response to the motion to lift the stay.

779 F.2d at 1074.

In the case of *In re Apex Properties, Limited,* Civil Action No. 88–0056 (D.N.J. May 6, 1988), the Honorable Mitchel H. Cohen, Senior Judge, United States District Court, relied upon the *Little Creek* decision in affirming an order of the Honorable Judith H. Wizmur, which granted dismissal of the chapter 11 involuntary bankruptcy petition filed against Apex Properties, Ltd. In that case the state court had issued an order dissolving Apex Properties, Ltd., a New Jersey limited partnership, and directing that its sole asset, a property in Atlantic City, be sold. One of the limited partners submitted an offer on behalf of a third party to purchase the property. The state court appointed receiver recommended the sale of the property to another party. The state court issued an order adopting the recommendation of the receiver. The limited partner obtained a temporary stay of the sale. At the time that the limited partner was required to post a $1.5 million bond to continue the stay, no bond was posted, instead an Involuntary Chapter 11 was filed against the limited partnership. Apex then filed a motion to dismiss the involuntary petition which was granted by the bankruptcy court. Judge Cohen found that:

> Apex has only one asset, the Atlantic City property; there are no employees and no ongoing business; the Mayflower property is to be sold by order of the state court; and, Shamy [the limited partner] has been required to post a bond to stay the sale pending appeal of the state court decision to the state appellate division.

When the above-mentioned circumstances are present,

> [r]esort to the protection of the bankruptcy laws is not proper ... because there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation, except according to the debtor's "terminal euphoria."

*Little Creek, supra,* 779 F.2d at 1073. *Id.* at p. 16.

■ Generally, where a debtor's reorganization effort involves essentially a two party dispute resolveable in state court, and the filing for relief under the Bankruptcy Code is intended to frustrate the legitimate efforts of creditors to enforce their rights against the debtor, dismissal for "cause" is warranted. *See e.g., In re Brandywine Associates, Limited,* 85 B.R. 626 (Bankr.M.D.Fla.1988). (Dismissal warranted where single asset debtor without direct employees or material unsecured creditors and with one secured creditor, sought to forestall foreclosure); *In re Waldron,* 785 F.2d 936 (11th Cir.1986) (Solvent debtors invoked the bankruptcy process to reject real estate option agreement to secure more profitable deal, and prevent creditor from seeking specific performance in state court); *In re Randy Homes Corporation,* 86 B.R. 259 (Bankr.M.D.Fla. 1988) (Debtor, whose sole asset is an undeveloped parcel of real property, generating no income and who had no employees or existing business operations and never made any attempts to develop the real property, filed petition to forestall state court foreclosure action); *In re Noco, Inc.,* 76 B.R. 839 (Bankr.N.D.Fla.1987) (Court's dismissal of the bankruptcy petition

grounded in part on finding that the debtors were "... clearly attempting to use the reorganization process to litigate nonbankruptcy issues and to avoid the burdens of a contract ..."); *Matter of Young*, 76 B.R. 376 (Bankr.D.Del.1987) (Dismissal warranted where the debtor filed a chapter 11 petition in an attempt to stop a court ordered award of specific performance).

The facts in the case of *In re Wally Findlay Galleries (New York), Inc.*, 36 B.R. 849 (Bankr.S.D.N.Y.1984) are strikingly similar to the facts now before the court. In that case, the debtor operated an art gallery under a franchise agreement with Wally Findlay Galleries International, Inc. (International) and a lease with Walstein C. Findlay Realty, Inc. (Realty) which were executed on October 1, 1980. At that time the debtor executed a promissory note in favor of International in partial payment of the franchise fee. As part of the transaction, International sold all of its outstanding stock to the Borynack Corporation. In partial payment for the stock Borynack Corporation executed a promissory note in favor of International for $96,000.00 payable in installments. Both notes provided for acceleration in the event of a default. James R. Borynack, the sole shareholder of Borynack Corporation guaranteed the obligations of the corporation. Ultimately the debtor and Borynack Corporation defaulted in payment of installments on their respective obligations. On February 4, 1983 the New York State Supreme Court granted International's motion for summary judgment in lieu of complaint on *inter alia*, the instruments above mentioned. On May 3, 1983 the state court entered a judgment obligating the debtor to pay $147,129.80 to International and obligating Borynack Corporation and James R. Borynack to pay the sum of $113,820.00 to International. On October 26, 1982 Realty terminated its lease with the debtor due to the nonpayment of the notes as an event of default under the lease. Thereafter, Realty filed a complaint in state court which included a cause of action for ejectment. On June 16, 1983, the state court granted Realty's summary judgment on this cause of action. On May 3, 1983, the same date as the court entered summary judgment on the notes, the debtor filed a voluntary Chapter 11 bankruptcy petition which stayed litigation with Realty. By application filed June 1, 1983 the debtor removed these actions to the bankruptcy court. The matter before the court in *Wally* was brought on by International and Realty seeking dismissal of the debtor's petition "for cause" pursuant to § 1112(b). The bankruptcy court concluded:

It is clear that the debtor did not file its petition to reorganize, but rather as a litigating tactic in its dispute with International and Realty. The petition was filed the same day that judgments on the promissory notes were entered in the state court. *See In re Ripples of Clearview, Inc.*, 26 B.R. 453, 455 (Bkrtcy.E.D. N.Y.1983). Neither the debtor, the Borynack Corporation, nor Mr. Borynack has sufficient assets to post a bond in order to stay these judgments pending appeal. The debtor filed its petition herein to avoid the consequences of adverse state court decisions while it continues litigating. This court should not, and will not, act as a substitute for a supersedeas bond of state court proceedings.

The debtor also seeks to use this court as an appellate forum to review the state court's grant of summary judgment on the notes in the context of a lease assumption. Pursuant to 11 U.S.C. § 365, in order for an unexpired lease to be assumed, defaults must be cured, or adequate assurance of prompt cure must be provided.

*Id.* at 851. In response to the debtor's proposal to cure the defaults under its lease with Realty and the nonpayment of franchise fees by litigating its claim that International and Realty conspired to devalue the debtor's franchise in order to recapture the lease, the *Wally* court found:

Justice Fraiman of the New York State Supreme Court granted summary judgment on the notes, rejecting the debtor's assertion of meritorious counterclaims based on the alleged conspiracy. He denied the debtor's motion to renew or reargue. It is not this court's function to

review a state court grant of summary judgment. *See In re Pagoda International, Inc.*, 26 B.R. 18, 21 (Bankr.D.Md. 1982).

*Id.* The *Wally* case is instructive on the proposition that a debtor's employment of litigation tactics, such as the use of the bankruptcy forum for purposes other than reorganization, constitutes "cause" for dismissal within the meaning of 11 U.S.C. § 1112(b).

The Eleventh Circuit in the case of *Phoenix Piccadilly Ltd.*, 849 F.2d 1393 (11th Cir.1988) affirmed four orders of the bankruptcy court affirmed by the district court of which three orders granted relief from the automatic stay to three secured creditors and from an order dismissing the Chapter 11 case. In that case the bankruptcy court had made a finding that the petition was not filed in good faith but rather for the purpose of delaying and frustrating the efforts of secured creditors to enforce their rights in the subject property. The property was comprised of four phases known as Phases I, II, III and IV. The three secured creditors separately held first mortgage liens on all four phases. An additional party held a note which was secured by a "wraparound" mortgage encumbering the entire property. On June 19, 1987 mortgage foreclosure proceedings were instituted by one of the three secured creditors. On June 29, 1987 an order was entered in the state court action appointing a receiver for Phase III of the property. The debtor filed its Chapter 11 petition on November 19, 1987, the day before a hearing in the state court action to appoint a receiver for the other three phases of the property. All three secured creditors filed motions for relief from the automatic stay and subsequently filed motions to dismiss the Chapter 11 case. The Eleventh Circuit noted that while there is no particular test for determining whether a debtor has filed a petition in bad faith, "the courts may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions' or, in particular, factors which evidence that the petition was filed 'to delay or frustrate the legitimate efforts of secured creditors to enforce their rights.'" *Id.* at 1394 (citation omitted).

The Eleventh Circuit held that the bankruptcy court's finding of bad faith was supported by the record where the court found that:

(i) The Debtor has only one asset, the Property, in which it does not hold legal title;

(ii) The Debtor has few unsecured creditors whose claims are small in relation to the claims of the Secured Creditors;

(iii) The Debtor has few employees;

(iv) The Property is the subject of a foreclosure action as a result of arrearages on the debt;

(v) The Debtor's financial problems involve essentially a dispute between the Debtor and the Secured Creditors which can be resolved in the pending State Court Action; and

(vi) The timing of the Debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the Debtor's secured creditors to enforce their rights.

849 F.2d at 1394.

In so ruling the Eleventh Circuit noted that the possibility of a successful reorganization cannot transform a bad faith filing into one undertaken in good faith:

Because the bankruptcy court found that a bad faith filing had occurred, it properly did not change the consequences of that finding simply because of the debtor's possible equity in the property or potential for successful reorganization. We reject the debtor's argument that the bankruptcy court cannot ever dismiss a case for bad faith if there is equity in the property because the presence of equity indicates the potential for a successful reorganization. Rather, as this Court stated in *In re Natural Land* [825 F.2d 296 (11th Cir.1987)]:

the taint of a petition filed in bad faith must naturally extend to any subsequent reorganization proposal; thus, any proposal submitted by a debtor who filed his petition in bad faith

would fail to meet section 1129's good faith requirement.

825 F.2d at 298.

849 F.2d at 1395.

■ In this case, the debtor corporation was formed for the purpose of dividing and developing the Property. (Girard Dep. at 62). Except for the utilization of professionals, including engineers, planners and attorneys, Ravick Corporation has no employees except for Girard, who is also its sole officer, shareholder and employee. (Girard Dep. at 8). The debtor has no cash flow, and no source of income, except for cash generated by disposal of portions of the Property. (Girard Dep. at 47–48). Nor does the debtor own or lease any machinery, office equipment or automobiles (Girard Dep. at 13–14). The debtor does not produce any goods or perform any services; it maintains no inventory, has no accounts receivable and it does not maintain financial statements (Girard Dep. at 46–48). Moreover, it appears that at the time of the bankruptcy filing the debtor was not a party to any formal legal proceedings aside from the state court action before Judge Wells. (Girard Dep. at 16).

The debtor's bankruptcy petition indicates that the Ravick Corporation has only one secured creditor, Mainstay Federal Savings & Loan Association, which, according to the debtor's schedules, holds a first mortgage on 85.626 acres of the Property to secure the payment of $2,001,705.00 (See Schedule A–2). At the May 9, 1989 hearing on the instant motion, counsel for Mainstay Savings & Loan Association represented that Mainstay had failed to receive interest payments due from the debtor since June 1988 and that as of March 31, 1989 Mainstay was due from the debtor the total sum of $2,163,673.10 comprising principal of $1,944,027.76, past due interest of $199,-598.28 and an extension fee of $20,047.06. The debtor's Schedule A–3 lists its unsecured creditors, other than Prisand,[3] as follows: (1) DeFalco & Bisconti, (for a claim in the amount of $8,936.00); (2) First Indemnity of America Insurance Company (for contingent liability on two construction bonds; amount of claim listed as $1.00 on debtor's Schedule A–3); (3) Lord, Anderson, Worrell, Barnett (for a claim in the amount of $1,520.00); and (4) Mat'l Engrg. & Testing Service (for a claim in the amount of $2,416.40). In sum, the class of unsecured creditors other than Prisand total four, the aggregate amount of which is $12,873.40. The claims of unsecured creditors are clearly relatively small in connection with the other claims. In the "Debtor's Opposition to Application of Gary Prisand" the debtor asserts that at the time of the filing the debtor was encountering problems with its primary lender, Mainstay Federal Savings & Loan Association for payment of $37,943.38 in interest, together with the sum of $3,000.00 for the costs of an appraisal, and that payment of same would have exhausted nearly all the funds of the debtor. (See Debtor's Opposition to Application for Prisand at ¶ 57).

In support of this proposition the debtor presents two separate letters which the debtor received in September 1988 and November 1988. On September 28, 1988 Raymond Girard, as President of the debtor received a letter from Frank P. Sullivan, of RAM Mortgage Investors, Inc. which stated:

> Pursuant to our meeting of September 2, 1988, we anxiously await the outcome of your lawsuit with Gary Prisand.
>
> Please be advised however, that as the month comes to a close an interest payment must be made. Mainstay Federal has been extremely patient while you have worked through your problems and will continue to work along with you be it to restructure the loan or whatever. They must receive some interest in order to get the loan current, which helps to facilitate their ability to work with you.

---

3. Prisand is listed as an unsecured creditor having the following claims:
 (1) Advanced payment for buildings lots $100,000.00

(2) Breach of Contract
Debtor intends to seek determination that contract with Prisand is void. Claim is contingent and unliquidated. $1.00

Please feel free to contact me should you have any questions or comments.

Very truly yours,

FRANK P. SULLIVAN

(*See* Debtor's Exhibits, Exhibit J).

On November 2, 1988 Mr. Girard, again as President of the debtor received the following letter from James L. Stites, Senior Vice–President of Mainstay Federal Savings & Loan Association which stated:

Enclosed please find your most recent interest billing indicating a payment of $37,943.38 due. Also, enclosed please find the copy of TMR Appraisal Services bill for $3,000.00, which has been charged to your loan balance.

Kindly advise me as to the status of his project. Has the court made final judgment concerning the Prisand Contract? When can we expect this project to move forward toward completion? We are anxious, as we are sure you are to resolve the problems holding up progress of this development.

Very truly yours,

James L. Stites

Senior Vice President

(*See* Debtor's Exhibits, Exhibit K).

Notwithstanding Mainstay's request for payment, nothing in the record before this court indicates that at the time the petition was filed, creditors were pressing the debtor to take any action.[4]

Most significantly, the record indicates that the debtor and/or Girard filed its chapter 11 petition in order to (1) avoid the Ravick–Prisand contract and liquidate the Property (Girard Dep. at 48); (2) avoid personal liability on the part of Girard on the Mainstay loan and the Prisand Contract (Girard Dep. at 95–97); and (3) avoid entry of an order by Judge Wells granting Prisand partial summary judgment against the debtor on the issue of specific performance on the Contract (Debtor's Opposition to Application at ¶ 2). The very timing of the petition in this case, just two days before the return date on the debtor's and

Girard's motion for reconsideration in the state court action, makes the debtor's motives suspect. *See e.g. Century City*, 8 B.R. at 33. This court cannot sanction the debtor's use of the bankruptcy court as a litigation tactic. *See e.g. Wally, supra*, 36 B.R. 849.

Ravick claims that it comes into this bankruptcy proceeding with four assets which it wishes to utilize to reorganize. The assets, according to Ravick, include:

(1) Approximately 67 acres located in Mt. Laurel, New Jersey for which preliminary approval has been obtained to construct 341 living units. The debtor values this "asset" at $7,949,991.00. This is real property which is the subject of the Prisand Contract.

(2) Two vacant lots with final Township approval valued at $90,000.00.

(3) A vacant parcel of land consisting of 6.4 acres and valued at $600,939.00.

(4) A Contingent unliquidated claim against the United States Government for the "taking" which resulted from the classification of 18.5 acres of the Property as wetlands. This cause of action was valued at $1.00.

(*See* Debtor's Opposition to Application of Prisand, ¶ 1). Ravick claims that it made a good faith decision to use the bankruptcy process to maximize the value of its assets. Ravick believes that it can realize at least $6,639,000.00 from the liquidation of these four assets and that it can then make an outright distribution to creditors. This distribution is based upon a total valuation of assets of $8,640,931.00 less the lien of Mainstay calculated at $2,001,000.00. (*See* Debtor's Opposition to Application of Prisand at ¶ 3). The debtor relies upon a real estate appraisal dated October 6, 1988 performed by TMR Appraisal Services, Inc., for Mainstay Federal Savings & Loan Association, which indicates a Market Value as of September 28, 1988 for real property identified as Block 904, Lots 1 and 2 of $8,040,000.00. (*See* Debtor's "Exhibit A"). The debtor also asserts that with regard to

---

**4.** Since that time, Mainstay on May 11, 1988 filed a motion for relief from the automatic

stay, which is pending before this court.

its claim against the United States Government for compensation resulting from the taking caused by classification of 18.5 acres of the debtor's land as wetlands while the likelihood of recovery is uncertain at this time, the debtor stands to recover approximately $2,114,000.00 which will also be utilized to fund its plan. (*See* Debtor's Opposition to Application of Prisand at ¶ 4). Of course, this plan would require a decision by this court to release Ravick from its obligation to Prisand under the Contract pursuant to 11 U.S.C. § 365.

In an affidavit filed on May 2, 1989 Girard states with regard to "Options Available to Ravick Corporation in Formulating a Plan of Reorganization":

1. Ravick Corporation has not and will not seek a new purchaser for the land which is the subject of the Prisand contract unless the Court rules favorably on Debtor's Motion to reject that contract.

2. Ravick Corporation has been approached by at least one regional developer who would like to purchase this property.

3. Again, assuming the Court does allow Ravick to reject the contract of Gary Prisand, Debtor does have an option other than an outright sale of its land.

4. Ravick Corporation could undertake the construction and sale of townhouses/residences on Debtor's land, either by itself or as a joint venture with another entity.

5. Residences in this development which have been constructed by Gary Prisand are now selling at prices between $165,000.00 and $235,000.00 each.

6. It is clear that this option could result in sufficient proceeds to pay creditors in full and allow Ravick to continue in business.

(*See* Affidavit at ¶ 10–15).

This court rejects the debtor's position in this matter for at least two reasons. First, the fact that a tract of property, such as the one at issue, has been subdivided, does not mean that more than one asset has been created. In this case, all of the prop-

erty of the debtor's estate is the subject of the Ravick–Prisand contract except for (a) two vacant lots, and (b) a vacant parcel consisting of 6.4 acres. Second, ultimate resolution of this matter would force this court to decide issues already determined by Judge Wells in the state court action including the debtor's claims that it was a "victim" of both the Army Corps' wetlands determination and the New Jersey Supreme Court's decision in the *Mount Laurel* case. Judge Wells expressly found, *inter alia*, that (1) Ravick's performance under the Agreement was not excusable since failure to obtain government approvals for the contracted property was a foreseeable risk which Ravick expressly assumed; and (2) the decrease in the number of lots due to the Army Corps' wetlands determination does not entitle Ravick to the defense of impossibility. These findings undercut the thrust of Ravick's position that final approval for the balance of the development from the Mt. Laurel Township Planning Board was a condition precedent to completion of the subject Agreement. (*See* Girard Affidavit, filed May 2, 1989, at ¶ s 31–34). Ravick Corporation is a classic example of the "new debtor syndrome" described by the Honorable Edith Hollan Jones for the Fifth Circuit in the *Little Creek Development* case. "The 'new debtor syndrome,' in which a one-asset entity has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors, exemplifies, although it does not uniquely categorize, bad faith cases." 779 F.2d at 1073 (citations and footnote omitted).

All of the foregoing leads this court to conclude that Ravick Corporation's true motives in filing its Chapter 11 petition were not rehabilitative but were to utilize the bankruptcy court as a means of renegotiating the terms of its Contract with Prisand, in view of what the debtor believes to be the increased value of the property since the execution date of the Contract, and the possibility of securing a purchaser that would enhance the debtor's ultimate profit on the Property. In this regard the court notes that "the bankruptcy laws are intend-

ed as a shield not a sword." *Waldron,* 785 F.2d at 940.

The debtor's alleged actions in aid of reorganization and its preliminary plan of reorganization, not yet submitted to the court, do not undermine the court's finding that Ravick's motives in filing were not rehabilitative. Girard represents to the court that since the filing of the petition, Ravick secured a renewal extension to December 19, 1989 of its stream encroachment permit from the State of New Jersey Department of Environmental Protection. (Girard Supplemental Affidavit, filed May 9, 1989, at ¶ 2). The debtor further represents that it has a loan commitment from Mainstay Federal Savings & Loan Association for an additional $1 million which it can use to finance its business plan (Debtor's Opposition at ¶ 24). Ravick proposes (1) to sell or develop the 6 acre parcel of property adjacent to the land which is the subject of the Prisand Contract, which has been listed for sale at a price of $675,000.00 (Debtor's Opposition at ¶ 13 and ¶ 19); (2) to construct and sell housing units on the 2 lots reserved from the first closing and the approximately 341 lots which are the subject of the Prisand Contract either on its own or as a joint venture with another entity (Debtor's Opposition at ¶ 20); (3) to pursue a claim against the United States for compensation for the "taking" of property; and (4) to seek rejection of the executory contract with Prisand. To begin with, the Contract at issue requires transfer of developed units and valid permits—the actions taken by the debtor in this regard are contractual obligations, not actions in aid of reorganization. Moreover, the debtor's plans with respect to the possible sale of the Property to potential third party buyers, based upon a successful rejection of the executory contract, bolster this court's finding that the debtor's intent behind filing its petition was to avoid the Prisand Contract and obtain enhanced profit. The fact that Ravick plans at this time to also pursue a claim against the United States does not negate this court's findings.

In addition to the foregoing, the court rejects Ravick's argument that this case is factually distinguishable from a typical two-party dispute on several grounds including that Mainstay Savings & Loan Association holds a first mortgage on 85.626 acres of the Property. This court recognizes that bankruptcy petitions arising out of two party disputes do not per se constitute a bad faith filing. *In re Stolrows, Inc.,* 84 B.R. 167, 171 (9th Cir. BAP 1988) *citing In re Hulse,* 66 B.R. 681, 683 (Bankr.M.D.Fla.1986). However, the court cannot disregard the other factor indicative of Ravick's misuse of the Bankruptcy Code's reorganization provisions, including the clear intent of the debtor and Girard to avoid liability on the Contract; the timing of the filing of the Chapter 11 petition; and the debtor's unsecured debt relative to its entire estate; Girard's position as sole employee, officer and shareholder of Ravick Corp. The very essence of a determination of good faith in the context of a motion to dismiss is the cumulative impact of the particular facts of a case. The fact that Mainstay maintains a first mortgage on the Property due to construction financing simply does not suffice to show that dismissal is unwarranted.

Finally, the debtor relies heavily on the case of *In re Marina Enterprises, Inc.,* 14 B.R. 327 (Bankr.S.D.Fla.1981) in support of the proposition that single asset debtors have been allowed to continue chapter 11 proceedings. In *Marina,* the debtor's sole asset was an undeveloped tract of real estate subject to a lease requiring the debtor, as lessor to construct an 18–story building to be used as a casino and hotel. The petition was filed on January 28, 1981, immediately following a partial summary judgment of foreclosure of a purchase money mortgage on January 27, 1981. After filing its Chapter 11 petition, the debtor, as lessor filed an application with the bankruptcy court for an order rejecting and disaffirming the lease on the subject property between itself as lessor and lessee, Casino by the Sea Corporation ("Casino"). Casino filed an answer to the debtor's application and also filed a motion to dismiss the Chapter 11 proceeding to trans-

fer venue to the Bankruptcy Court for the District of New Jersey. The bankruptcy court denied the motion to dismiss, noting that:

> It is true that the debtor has no business or going concern value. However, it does have its equity in the subject property on which a successful reorganization might be predicated. The court cannot prejudge whether or not a successful and confirmable plan of reorganization will be submitted. The issue of equity in its assets will be explained more fully below when the issue of rejection of the lease is considered.

*Id.* at 331. The *Marina* court rejected the Casino's assertion that the debtor's utilization of the bankruptcy process and particularly its effort to reject the lease which Casino held on the subject property was an improper use of the bankruptcy process. The court stated: "The experience of this court is that most of the business debtors which come to it do so as a result of undercapitalization and poor business judgment in the past." *Id.*

In addition, the *Marina* court denied Casino's motion to transfer venue and permitted rejection of the contract pursuant to 11 U.S.C. § 365, finding that "there could be no realistic anticipation of successful reorganization or rehabilitation without rejection of the lease." *Id.* at 333. The court recognized that (1) the rent the debtor was to receive would not even cover debt service much less give a realistic return on

investment; (2) the debtor was unable to obtain construction financing because of the "improvident lease"; and (3) under the facts in that case the debtor-in-possession was entitled to reject the subject lease in the exercise of its business judgment. *Id.*

This court rejects Ravick's reliance on the *Marina* case. Rejection of the lease in that case served a useful purpose for the debtor which was financially troubled and who could not obtain the financing required to complete the lease terms. "In [*Marina*], rejection was permitted to serve the intended purpose of chapter 11—to facilitate the adjustment of debts through reorganization." *Waldron*, 785 F.2d at 940. The record before this court clearly and unambiguously establishes that the debtor herein simply seeks to renegotiate the original Contract with Prisand, and to essentially relitigate issues decided by the state court.

■ In sum, this court finds that the Ravick's filing of its chapter 11 bankruptcy petition was not done in "good faith" but rather for an improper purpose and hereby grants Prisand's motion to dismiss the bankruptcy for "cause" pursuant to 11 U.S.C. § 1112(b). As a result, the court finds it unnecessary to reach the issues of (1) whether the debtor can effectuate a reorganization plan; (2) whether Ravick's filing caused undue delay to creditor; and (3) whether abstention is appropriate in this case or in the pending adversary proceeding.[5]

---

**5.** It is self evident that, as a general rule, the dismissal of a bankruptcy petition results in the concomitant dismissal of all pending adversary proceedings. *In re Stardust Inn, Inc.*, 70 B.R. 888, 890 (Bankr.E.D.Pa.1987); *In re Pocklington*, 21 B.R. 199, 202 (Bankr.S.D.Cal.1982). This is particularly true of adversary proceedings which are "related" to the bankruptcy case pursuant to 28 U.S.C. § 157(c)(1) since the related proceeding can only be heard by a bankruptcy court because of its nexus to the debtor's bankruptcy case. *See Stardust Inn, supra*, 70 B.R. at 890. *See generally, Pacor v. Higgins*, 743 F.2d 984 (3d Cir.1984). *Cf. In re Lake Tahoe Land Co., Inc.*, 12 B.R. 479 (Bankr.D.Nev.1981) (bankruptcy court maintained jurisdiction over adversary proceeding after underlying bankruptcy proceeding dismissed where the statute of limitations for creditor to file action to recover a deficiency judgment in state court lapsed). Ac-

cordingly, dismissal of the Chapter 11 bankruptcy petition herein results in dismissal of Adversary Proceeding No. 88–1089 entitled *Ravick Corporation v. Gary Prisand, Mt. Laurel Development Associates and Union Mill Farms Associates.*

In the case of *Matter of Solar Equipment Corp.*, 19 B.R. 1010 (W.D.La.1982) the District Court for the Western District of Louisiana held that, upon dismissal of the debtor's bankruptcy petition, the bankruptcy court relinquished subject matter jurisdiction to continue the automatic stay provisions of § 362, and to make a determination of the debtor's tax liability pursuant to § 505. This rationale applies with equal force to the debtor's motion, filed December 21, 1988, to reject the contract entered into between the debtor and Prisand pursuant to 11 U.S.C. § 365. Accordingly, the court having dismissed the debtor's bankruptcy petition, hereby relinquish-

An order in conformance with this opinion shall be submitted to the court.

es subject matter jurisdiction to decide the debtor's pending § 365 motion.