**In re Celia SHAR, Debtor.**

**In re Marilyn Ziemke, Debtor.**

**Nos. 97–41398(RG), 97–41399(RG).**

United States Bankruptcy Court,
D. New Jersey.

April 12, 1999.

Ravin, Greenberg & Marks, P.A., by Gary N. Marks, Parkway Roseland, NJ, for Debtors/Debtors–In–Possession.

The Feinsilver Law Group by David Feinsilver, Millburn, NJ, for Judgment Creditors, Shalom Almog and Irit Almog.

Schwartz, Tobia, Stanziale, Becker, Rosensweig & Sedita, PA by Ben H. Becker, Montclair, NJ, for Judgment Creditors, Shalom Almog, Irit Almog and Ben Ami Geller.

Lampf, Lipkind, Prupis, Petigrow & Labue by Andrew S. Berns, West Orange, NJ, for Creditor, Ben Ami Geller.

### OPINION

ROSEMARY GAMBARDELLA, Chief Judge.

### MATTER BEFORE THE COURT

This matter comes before the Court on the motion of judgment creditors, Shalom Almog and Irit Almog and Ben Ami Geller (collectively "Judgement Creditors") to dismiss Celia Shar's and Marilyn Ziemke's (the "Debtors") Chapter 11 bankruptcy petitions for cause pursuant to 11 U.S.C. § 1112(b), as bad faith filings intended to frustrate the legitimate efforts of the Judgment Creditors and alternatively, for relief from the automatic stay pursuant to 11 U.S.C. § 362(d), to enable the Judgment Creditors to pursue state court remedies, and for the imposition of sanctions. In response, the Debtors argue that the Judgement Creditors fail to demonstrate "cause" warranting dismissal of the Debtors' respective petitions or relief from the automatic stay. Additionally, the Debtors assert that since the Judgment Creditors have recourse against the Debtors under Section 523 of the Bankruptcy Code (the "Code") which deals with non-dischargeability, dismissal of the petitions would be inequitable. The Debtors have filed a cross-motion for rejection of a certain escrow agreement pursuant to 11 U.S.C. § 365(a), and a motion for an order further extending the Debtors' Exclusivity periods to file plans of reorganization and obtain acceptances thereto, pursuant to 11 U.S.C. § 1121(d).

Hearings in these motions were held on January 19, 1999. The following represents this Court's findings of fact and conclusions of law.

### FACTS

On October 1, 1997, the Debtors Celia Shar and her daughter, Marilyn Ziemke, filed their respective separate voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code and were both certified as debtors-in-possession pursuant to § 1107 of the Code. By way of an Order dated October 14, 1997, the Debtors' individual bankruptcy proceedings were procedurally consolidated for purposes of joint administration under Fed. R. Bankr.P. 1015.

Prior to filing for bankruptcy, Debtors operated a business known as Israel Travel Advisory Services ("ITAS"). The Judgment Creditors, all Israeli citizens, brought an action for defamation against the Debtors, New Jersey residents, in

New Jersey Superior Court and obtained a final judgment against the Debtors and the Debtors' wholly owned corporation, Israel Travel Advisory Services, ("ITAS"). The facts and resolution of the state court trial and subsequent judgment are more fully set forth in *Almog v. Israel Travel Advisory Service, Inc.*, 298 N.J.Super. 145, 689 A.2d 158 (1997), and familiarity with this case is presumed.[1]

For purposes of the within proceeding, the relevant facts are that the jury awarded Shalom Almog $525,000 for injury to reputation, $775,000 for loss of income, and $24,000 on a book account claim for a total of $1,324,000. The jury also awarded Irit Almog $200,000 for her per quod claim and Geller $40,000 for loss of reputation. The jury determined that both Shalom Almog and Geller were entitled to punitive damages and, following a second trial on that issue, the same jury awarded Shalom Almog $4,500,000 and Geller $1,000,000. 298 N.J.Super. at 149, 689 A.2d 158. Thus, the Almogs' principal claim is for $6,024,000; and Geller's is for $1,040,000. Additionally, as the Debtors point out, with post-judgment interest the judgment may now be in excess of $10,000,000. See Marilyn Ziemke Certification in Opposition to Judgment Creditors' Motion to Dismiss Petitions or for Stay Relief and in Support of Debtors' Cross–Motion to Reject Escrow Agreement as an Executory Con-

tract, at ¶ 4 ("Ziemke Cert."). The Judgment Creditors assert that they hold a final judgment against the Debtors and ITAS in the aggregate principal amount, with pre and post-judgment interest, in accordance with an Amended Final Judgment entered March 11, 1997 of $10,455,851.00 as of the date of the filing date of the Chapter 11 petitions herein.

In regards to the state court judgment, the Debtors have exhausted the appeals process. The New Jersey Supreme Court originally granted certification and heard oral argument. However, after the New Jersey Supreme Court determined that certification was improvidently granted, the appeal was dismissed. The Debtors and ITAS filed a motion for reconsideration which was denied by the New Jersey Supreme Court. By Order of October 5, 1998, the United States Supreme Court denied the Debtors' petitions for certiorari. On November 16, 1998, the United States Supreme Court entered an order denying a rehearing.

On January 6, 1994, pursuant to a consent order entered by the Hon. William A. Dreier, J.A.D., the Debtors, Sig Ziemke, the husband of Marilyn Ziemke, and ITAS entered into an "Agreement for Collateral Security and Stay of Execution" and an "Escrow Agreement" with the Judgment Creditors whereby the Debtors would

---

**1.** The Appellate Court found that "the jury had ample evidential basis from which to conclude that defendants Shar and Ziemke and their company took concerted, malicious and purposeful action over a significant period of time to destroy both Almog and Geller as respected members of their community, that they did so with total disregard of the truth or of the personal consequences to them and their families, and that in large measure they succeeded." 298 N.J.Super. 145, 153, 689 A.2d 158 (1997). The Appellate Court affirmed the jury's finding that Shar and Ziemke had falsely and repeatedly accused Almog "of gross theft and of having an extra-marital affair with his ex-wife ... and that they published these stories to anyone who would listen, including Almog's former commanding officer, who advised him to leave Israel as his reputation and prospects were

finished there. Both Almog and his wife gave testimony that the jury was free to credit, respecting the substantial physical and emotional harm done to them as a result of defendants' [Debtors'] actions." *Id.* at 152, 689 A.2d 158.

With regard to Geller, the Appellate Court stated that the evidence supported the jury's finding that Debtors maliciously slandered and defamed Geller as well. Specifically, the jury found that Debtors accused Geller "to all and sundry, of having seduced the daughter of a major Israeli restaurant owner and causing Geller and his wife to be subject to criminal investigation by the Israeli tax authorities, by whom he was eventually exonerated after suffering out-of-pocket losses, impairment of reputation, and emotional distress." *Id.* at 153, 689 A.2d 158.

place certain property in escrow with an agreed escrow agent, Howard B. Goldberg, Esq. Copies of the Collateral Security Agreement and the Escrow Agreement are attached as Exhibit A to the Affidavit of David Feinsilver, Esq. ("Feinsilver Aff.") submitted in support of the Judgment Creditors' within motion to dismiss. See Feinsilver Aff. According to the agreements, the Debtors agreed to convey the ownership, possession and control of certain of their assets to the escrow agent and executed a second mortgage in the amount of $810,000.00 on their home at 18 Canoe Brook Drive, Livingston, N.J. In accordance with the Escrow Agreement, the Debtors represented by way of affidavits that all of their assets—except for $100,000.00 held by Celia Shar as a cash reserve (other than jewelry, furnishings, clothing and personal effects) were set forth in Schedule A—and are pledged to the Judgment Creditors. See Collateral Security Agreement, at p. 2, attached as Exhibit A to Feinsilver Aff.

The Judgment Creditors assert herein that Debtors transferred all of the material assets scheduled on their Chapter 11 petition to the Escrow Agent pursuant to the Collateral Security Agreement, inclusive of the granting of an $810,000 mortgage in favor of the Escrow Agent. See Judgment Creditors Brief, at p. 6. The Judgment Creditors assert that the only assets that were not escrowed are a cash reserve of $100,000, assorted furnishings, books, personal effects, wearing apparel and jewelry. *Id.*

The Judgment Creditors claim that the only other creditors affected in this proceeding are attorneys for the Debtors that are involved in the defense of this and related litigation. The Judgment Creditors are disputing these creditors' entitlement to fees. Additionally, the Judgment Creditors assert that "the only other named creditor (First Union Bank and its brokerage subsidiary) is fully secured, shall soon have no claim, and would thus be unaffected by the dismissal of the Petitions." Judgment Creditors' Brief, at p. 7.

On March 27, 1998, the Judgment Creditors filed a non-dischargeability complaint pursuant to § 523(a)(6) of the Code. *Shalom Almog, Irit Almog and Ben Ami Geller v. Celia Shar and Marilyn Ziemke,* (Adv.Proc. No. 98–2206). In the alternative, the Judgment Creditors request relief from the automatic stay pursuant to 11 U.S.C. § 362(d) to allow them to pursue state court remedies and sanctions. The Judgment Creditors also assert that the Debtors filed for reorganization in bad faith and that the Debtors actually have no intention of or reasonable ability of reorganizing. Additionally, the Judgment Creditors assert that the Chapter 11 cases are really a two-party civil dispute and that the Debtors filed their petitions for reorganization in bad faith to frustrate the collection by the Judgment Creditors of their debt. The Judgment Creditors argue that any proposed reorganization plan is futile and move for dismissal on the grounds that any plan of the Debtors would not be confirmable.

In response, the Debtors deny that their petitions were filed in bad faith. Additionally, the Debtors assert that since the Judgement Creditors have recourse under § 523 of the Code, dismissal of the petitions would be improper because of the "harsh consequences to the Debtors who, as set forth in the Certification of Mrs. Ziemke ... have unsecured claims of $775,000.00, exclusive of the $10,000,000.00 claim of the Judgment Creditors." Debtors' Brief in Opposition to Judgment Creditors' Motion to Dismiss Petitions or for Stay Relief and in Support of Debtors' Cross–Motion to Reject Escrow Agreement as an Executory Contract, ("Debtors' Brief") at p. 3.

The Debtors also argue that the Judgement Creditors are not entitled to stay relief because some or all of the Judgement Creditors' asserted lien may be unperfected or subject to avoidance. *See id.,* pp. 12–13. Furthermore, Debtors assert

that the assets affected by the Escrow Agreement are property of the estate under Section 541(a) of the Code. *See id.*, pp. 15–16.

The Debtors claim that although the language of the Escrow Agreement speaks in terms of assigning possession, control, and title to these assets, "it is clear that this was not intended as an absolute assignment of rights but rather an assignment for purposes of security only." Debtor's Brief, at p. 16. Thus, the Debtors argue that the assets contained in the Escrow Agreement are property of the estate subject to whatever lien rights that the Judgement Creditors may have. *See id.* at 17. The Debtors also claim that they have not yet been divested of their interest in the assets under the Escrow Agreement because the Judgement Creditors have not given the escrow agent an "Execution Notice" and then executed on the assets. *See id.* (citing Feinsilver Aff, Ex. "A"; Escrow Agreement, par. 3).[2]

In support of their argument, the Debtors assert that the assets in the Escrow Agreement "will not dissipate in value as long as they remain in escrow, they are adequately protected." Ziemke Cert., at ¶ 33. The Debtors assert that as the Judgment Creditors are both Israeli citizens and, according to the Debtors, known to have Swiss bank accounts, the Debtors argue that the release of these assets to the Judgment Creditors at this time will result in the assets' immediate transfer out of the country and outside the jurisdiction of this Court. *See id.*

Marilyn Ziemke further states in her Certification that these assets will be "essential" to any plan for reorganization that she and her mother, Celia Shar, file. *Id.* at ¶ 38.[3] Accordingly, the Debtors argue that stay relief would be premature and that the result would interfere with the Debtors' successful reorganization should the Court grant the Judgment Creditors such relief. *See id.*

Among their potential assets, the Debtors also list malpractice claims against the law firm of Connell, Foley, & Geiser for allegedly failing to call relevant witnesses, offer documents into evidence, and make appropriate objections at the defamation trial. See Ziemke Cert. and Exhibit "B" annexed thereto, and Letter from Glenn A. Bergenfield, Esq., dated December 18, 1998. Marilyn Ziemke states that the Debtors have commenced a legal action against Connell, Foley, & Geiser; met with a representative of the Essex County Prosecutor who she believes has commenced an investigation into the matter; and sought legal counsel for the purposes of perhaps filing a federal civil rights action. See Ziemke Cert., at ¶ 31 and Letter dated February 8, 1999 of Gary N. Marks,

---

**2.** The Escrow Agreement provides in part:

 3. a. In the event the Secured Party shall have the right to exercise the Secured Party's rights under the Agreement as to the collateral security, then the Secured Party shall give written notice (the "Execution Notice") to such effect to the Escrow Agent, the ITAS Defendants, S. Ziemke and H. Neil Broder, Esq., Broder & Associates, 33 Clinton Road, West Caldwell, New Jersey 07006; and

 b. The Secured Party may then proceed to execute on the collateral security in the order of priority set forth in the Agreement.

**3.** Specifically, Marilyn Ziemke states that a plan for reorganization would likely include:

 "a. Retaining the capital stock in ITAS and control of the business with payment to creditors to be made out of the ITAS cash flow.

 b. A sharing arrangement in the net proceeds of any recovery in our pending legal malpractice action against our former trial counsel in the defamation suit. Annexed hereto as Exhibit "A" is a letter from special litigation counsel who we have retained to prosecute this action in which he very candidly gives his assessment of our case.

 c. Keeping our house reaffirming the first mortgage.

 d. The actual form of the plan would be dependent upon whether the Almog/Geller liens are valid or not and the ultimate outcome of the nondischargeability adversary proceeding."

Ziemke Certification at ¶ 38.

Esq. to Court. The Debtors state that any recovery on these claims will ultimately determine the assets in the bankruptcy estate. Accordingly, the Debtors request that the Court refrain from granting stay relief until these collateral matters are resolved.

Since the January 19, 1999 hearing, the Court has received numerous correspondence from attorneys for the Debtors, Gary N. Marks, Esq., H. Neil Broder, Esq. and the Office of the Essex County Prosecutor (by Judy M. Gagliano, Esq.) concerning apparent communications between the Debtors and the Office of the Essex County Prosecutor and the apparent turnover to that office by Debtors' appellate counsel, Mr. Broder, of certain documents.

By way of a separate cross-motion, the Debtors claim that the Escrow Agreement is an executory contract that the Debtors may reject pursuant to § 365(a) of the Code. Specifically, Debtors assert that:

> [T]he Escrow Agent had numerous ongoing performance obligations on the petition date and these obligations are continuing. They include maintaining custody, control and possession of the assets entrusted to him. Second, in the event the Debtors default under the Escrow Agreement, paragraph 3 thereof imposes strict performance obligations on Almog and Geller, i.e., to provide written notice of such default the Escrow Agent and to execute on the assets in the order of priority set forth in the Agreement. Finally, the Debtors owe various duties, continuing duties the Escrow Agent under paragraph 6 of the Agreement, e.g., the duty to indemnify and hold the Escrow Agent harmless and to compensate the Escrow Agent for any time and expense in connection with the services to be rendered under the Agreement.

Debtors' Brief, at p. 25. The Debtors claim that their decision to reject the Escrow Agreement is "clearly reasonable," in the exercise of sound business judgment, and in the best interests of the estate.

*See id.* Thus, the Debtors conclude that the Court should grant their request to reject the Escrow Agreement and compel the turnover of the assets therein.

By separate motion, the Debtors seek an order pursuant to § 1121(d) extending the Debtors' exclusive period within which to file a plan for a period of sixty (60) days from the hearing to and including February 28, 1999 and to extend the time to obtain acceptances thereof for an additional sixty (60) days to and including April 30, 1999. While these dates have since past, the motion is still *sub judice* so that the Court can still consider an appropriate extension of these deadlines. As noted in the motion, pursuant to a Consent Order entered on November 9, 1998, the Debtors' exclusivity periods to file a plan was extended to November 30, 1998 and the time to solicit acceptances to a plan extended to January 29, 1999. This present motion was filed on November 25, 1998, prior to the expiration of the exclusivity period. The Debtors assert that "cause" exists to extend the exclusive periods. The Debtors assert that now that the appellate process has been concluded, the Debtors seek a reasonable period of time to determine whether a feasible plan can be proposed in these cases and that the Debtors are not seeking to extend the exclusivity periods to delay these proceedings or otherwise impair the rights of creditors. *See* Application in Support, at ¶¶ 11–12.

## DISCUSSION

### Whether Debtors Proposed Plans For Reorganization Are Confirmable

Section 1112(b) of the Bankruptcy Code states:

> (b) Except as provided in subsection (c) of this section, on request of a party in interest or the United States trustee, or bankruptcy administrator, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under

this chapter, whichever is in the best interest of creditors and the estate, for cause, including—

(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

(2) inability to effectuate a plan;

(3) unreasonable delay by the debtor that is prejudicial to creditors;

(4) failure to propose a plan under section 1121 of this title within any time fixed by the court;

(5) denial of confirmation of every proposed plan and denial of a request made for additional time for filing another plan or a modification of a plan;

(6) revocation of an order of confirmation under section 1144 of this title, and denial of confirmation of another plan or a modified plan under section 1129 of this title;

(7) inability to effectuate substantial consummation of a confirmed plan;

(8) material default by the debtor with respect to a confirmed plan;

(9) termination of a plan by reason of the occurrence of a condition specified in the plan; or

(10) nonpayment of any fees or charges required under chapter 123 of title 28.

11 U.S.C. § 1112(b). The legislative history of this section explains that:

[s]ubsection (b) gives wide discretion to the court to make an appropriate disposition of the case when a party in interest requests. The court is permitted to convert a reorganization case to a liquidation case or to dismiss the case, whichever is in the best interest of creditors and the estate, only for cause. Cause may include ... [the ten factors listed in § 1112(b)]. The list is not exhaustive. The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 405–06 (1977), U.S.Code Cong. & Admin.News 5963, 6361–62 (1977). Section 1112(b) does not define the term "cause" but instead sets forth a list of non-exclusive grounds which may constitute cause. *See e.g., In re Victory Construction Co.,* 9 B.R. 549, 558–60 (Bankr.C.D.Cal.1981), *vacated on other grounds,* 37 B.R. 222 (9th Cir. BAP 1984) ("cause" is any reason cognizable to the equity power and conscience of the court as constituting an abuse of the bankruptcy process).

■ Here, the Judgment Creditors contend that dismissal of the Debtors' petitions is warranted under § 1112(b) on the grounds that the Debtors' filed their bankruptcy petitions in bad faith to frustrate the Judgment Creditors' efforts to collect their compensatory and punitive damages award. The Judgment Creditors also assert that dismissal is warranted under § 1112(b) as any reorganization effort would be futile. By letter dated January 26, 1999, the Debtors also assert that their filed pleadings and their presentation to this Court on January 19, 1999 "sufficiently covered not only dismissal on grounds of 'bad faith' but also the enumerated grounds under § 1112(b)(1)–(3)." Gary N. Marks, Esq. Letter, dated January 26, 1999. Since the Debtors have opposed the motion to dismiss, the Judgment Creditors have the burden of proof on the issue of "cause." *See Ravick,* 106 B.R. at 842 (*citing* 3 Collier on Bankruptcy Manual, ¶ 1112.04 at p. 1112–17 (3d Ed.1987)).

■ Generally, there is a presumption that debtors file petitions for reorganization in good faith. *See In re Petralex Stainless, Ltd.,* 78 B.R. 738, 743 (Bankr. E.D.Pa.1987) (*citing U.S. Fidelity & Guar. Co. v. DJF Realty and Suppliers, Inc.,* 58 B.R. 1008 (N.D.N.Y.1986)). The burden of proving bad faith is on the moving party and must be demonstrated by a preponderance of the evidence. *See id.*

The Judgment Creditors argue that the Debtors' bankruptcy petitions were filed in bad faith because: (1) there is no possibili-

ty of successful reorganization without undue delay to the Judgment Creditors; (2) the petitions were filed as a litigation tactic to avoid having to pay off the Judgment Creditors;[4] (3) the Debtors' cases are essentially a two-party dispute; and (4) the nature and extent of the Debtors' assets and business operations indicates that they are not pursuing a reorganization. *See* Judgment Creditors' Brief, supra.

■ Although there is no express requirement in the Code that petitions be filed in good faith, the majority of courts find that there is an "implicit" good faith requirement in filing a bankruptcy petition to prevent fraud or abuse of the bankruptcy process. *See e.g. In re Trident Associates Ltd. Partnership*, 52 F.3d 127, 131 (6th Cir.1995), *cert. denied*, 516 U.S. 869, 116 S.Ct. 188, 133 L.Ed.2d 125 (1995) (upholding bankruptcy court's decision to lift automatic stay and dismiss petition because petitioner filed in bad faith to isolate insolvent property and its creditors on the eve of foreclosure); *In re Marsch*, 36 F.3d 825, 828 (9th Cir.1994); *Carolin Corporation v. Miller*, 886 F.2d 693, 698 (4th Cir. 1989) (finding requirement of good faith implicit in statutory language and legislative history of § 1112(b)); *Matter of Little Creek Development Co.*, 779 F.2d 1068, 1072 (5th Cir.1986) ("[E]very bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution and confirmation of bankruptcy proceedings"); *In re Albany Partners Limited*, 749 F.2d 670, 674 (11th Cir.1984); *see also In re Waldron*, 785 F.2d 936 (11th Cir.1986) (construing comparable sections under chapter 13); *In re Ravick Corporation*, 106 B.R. 834, 842–43 (Bankr.D.N.J. 1989) (A bankruptcy petition should be dismissed where the petition "is not filed to achieve the valid, legitimate purposes of the rehabilitat[ive] provisions of Chapter 11") (*citing In re Randy Homes Corpora-*

*tion*, 86 B.R. 259, 261 (Bankr.M.D.Fla. 1988)); *In re Clinton Centrifuge, Inc.*, 72 B.R. 900, 903–06 (Bankr.E.D.Pa.1987) (Although critical of using set standards focusing on the intent of the debtor in filing a petition, Bankruptcy Judge Fox agreed that bad faith was grounds for dismissal for "cause" under § 1112(b)). However, as one of the leading commentators on bankruptcy law states:

> [D]ismissal for lack of good faith lies within the court's discretion, with the admonition that the remedy is not one to be lightly applied ... Indeed, if it appears that creditors would be better off with a reorganization notwithstanding the debtor's bad faith, it might be an abuse of discretion for the court to order dismissal. On the other hand, if all of the creditors wish the reorganization to end, prompt dismissal may be in order.

7 Collier on Bankruptcy ¶ 1112.07[4] (L. King ed., 15th ed.1998) (citations omitted), see also *In re Johns–Manville*, 36 B.R. 727, 737 (Bankr.S.D.N.Y.1984) (in absence of express statutory requirement that petitions be filed in good faith, the concept should be applied only on a "limited ad hoc basis").

Courts have also held that a Chapter 11 petition filed in bad faith is "cause" to grant relief from the automatic stay under § 362(d)(1). *See In re Trident Associates Ltd. Partnership*, 52 F.3d at 131; *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir.1988); *In re Albany Partners, Ltd.*, 749 F.2d at 674.

In support of their argument that the Debtors' filed in bad faith, the Judgment Creditors cite case law standing for the proposition that a debtor's petition for reorganization should be dismissed where "there is no possibility of successful reorganization without inordinate delay and when the debtor entered the bankruptcy

---

4. In support of this point, the Judgment Creditors point out that the Debtors' petitions were filed two days after the entry of a September 29, 1997 Order by Hon. Alvin Weiss, A.J.S.C. extinguishing the stay of execution and imposing a $1,000.00 per diem sanction against the Debtors for failure to give discovery.

**630**

process without any real intention of reorganizing." Judgment Creditors' Brief, supra, at p. 12 (*citing Cinema Service Corp. v. Edbee Corp.*, 774 F.2d 584, 586 (3d Cir. 1985); *In re Newark Airport/Hotel Ltd. Partnership*, 156 B.R. 444, 448–49 (Bankr. D.N.J.1993); *Ravick*, 106 B.R. at 845). As evidence that the Debtors filed their petitions in bad faith, the Judgment Creditors focus on the Debtors' inability to effectuate a successful plan of reorganization. *See Judgment Creditors' Brief*, at pp. 11–15.

The Judgment Creditors also assert that the timing of the Debtors' filings is evidence of bad faith. *See id.* Specifically, the Judgment Creditors contend that the Debtors only filed for bankruptcy to avoid having to comply with Judge Weiss' Order extinguishing the stay of execution and imposing a $1,000.00 per diem sanction

against the Debtors for failure to give discovery. *See id.*, at p. 14.

■ Those courts which have dismissed petitions on bad faith grounds caution that "[t]he existence of 'bad faith' depends not on any one specific factor but on a combination of factors determined after careful examination of the facts of the particular debtor's case." *In re Newark Airport/Hotel Ltd. Partnership*, 156 B.R. at 448 (*citing In re Taylor*, 103 B.R. 511, 521 (D.N.J. 1989), aff'd, 913 F.2d 102 (3d Cir.1990)); *Cinema Serv. Corp. v. Edbee Corp.*, 774 F.2d 584 (3d Cir.1985); *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986), *see also In re Y.J. Sons & Co., Inc.*, 212 B.R. 793, 802 (D.N.J.1997) (in which District Judge Lechner outlines several factors for determining whether bad faith exists)[5]; *In re Clinton Centrifuge, Inc.*, 72 B.R. 900 (Bankr.E.D.Pa.1987)[6]. As this

---

5. In *In re Y.J. Sons & Co., Inc.*, 212 B.R. 793 (D.N.J.1997) District Court Judge Lechner noted that the following factors have been recognized as evidence of a bad faith filing:
 (i) The Debtor has only one asset, the Property, in which it does not hold legal title;
 (ii) The Debtor has few unsecured creditors whose claims are small in relation to the claims of the Secured Creditors;
 (iii) The Debtor has few employees;
 (iv) The Property is the subject of a foreclosure action as a result of arrearages on the debt;
 (v) The Debtor's financial problems involve essentially a dispute between the Debtor and the secured creditors which can be resolved in the State Court Action; and
 (vi) The timing of the Debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the Debtor's secured creditor to enforce their rights.
 *Id.* at 802 (*citing Phoenix Piccadilly*, 849 F.2d at 1394–95); *see also Little Creek*, 779 F.2d at 1072–73 (enumerating several factors for courts to consider in determining bad faith). The absence of any likelihood of rehabilitation is also considered grounds for dismissal and, depending on how unlikely rehabilitation is, a finding of bad faith. *See Little Creek*, 779 F.2d at 1073; *Roxy*, 170 B.R. at 573 ("The more objectively clear it is that the debtor cannot reorganize, it is concomitantly more difficult to conclude that the debtor's subjective belief in its ability to reorganize is in good faith") (*as quoted in Y.J. Sons & Co. Inc.*, 212 B.R. at 802).

6. In *In re Clinton Centrifuge, Inc.*, 72 B.R. 900 (Bankr.E.D.Pa.1987), Bankruptcy Judge Fox cites the following factors developed out of case law dealing with whether a petition was filed in bad faith, namely:
 1. The debtor has few or no unsecured creditors.
 2. There has been a previous bankruptcy petition by the debtor or a related entity.
 3. The pre-petition conduct of the debtor has been improper.
 4. The petition effectively allows the debtor to evade court orders.
 5. There are few debts to non-moving creditors
 6. The petition was filed on the eve of foreclosure
 7. The foreclosed property is the sole or major asset of the debtor.
 8. The debtor has no ongoing business or employees.
 9. There is no possibility or reorganization.
 10. The debtor's income is not sufficient to operate.
 11. There was no pressure from non-moving creditors.
 12. Reorganization essentially involves the resolution of a two-party dispute.
 13. A corporate debtor was formed and received title to its major assets immediately before the petition, and
 14. The debtor filed solely to create the automatic stay.
 *Id.* at 904; (*citing In Matter of Grieshop*, 63 B.R. 657, 662–63 (N.D.Ind.1986) (citation

Court has previously stated, in determining whether bad faith exists, "the facts and circumstances of a particular case must be examined and no one factor should be controlling." *Ravick*, 106 B.R. at 843.

■ Thus, while it seems highly unlikely that the Debtors' will be able to effectuate a successful reorganization, this fact alone does not require a finding of bad faith. *See In the Matter of Newark Airport/Hotel Limited Partnership*, 156 B.R. at 449 ("fact that the debtor may have insufficient cash flow to cover its debt service payments to [creditor] is not controlling since most chapter 11 debtors are having difficulty paying debt service at the time of filing") (citation omitted); *In re Clinton Centrifuge*, 72 B.R. at 908 (chapter 11 affords debtors opportunity to try and reorganize unless there is a basis to conclude that the case was filed with demonstrable frivolous purposes absent any economic reality or the reorganization process is being perverted in the case).[7] In addition, this Court is not convinced that the Debtors filed their petitions in bad faith merely because the Debtors' filings were prompted by litigation resulting in an outcome that put their financial well-being in jeopardy. Corporations and individuals often file for bankruptcy after having a substantial judgment entered against them and there is no reason to presume that these filings are in bad faith. The Court also notes that the Judgment Creditors failed to raise their bad faith objection to the Debtors' filings for bankruptcy for approximately one year.

■ Here, the facts do not support a finding that Debtors' filed their Chapter 11 bankruptcy petitions in bad faith. However, the facts do show that Debtors have unduly delayed in filing a plan for reorganization and that this delay has been prej-

omitted), *accord, In re Cooper Properties Liquidating Trust, Inc.*, 61 B.R. 531, 536–37 (Bankr.W.D.Tenn.1986)).

In *In re Clinton Centrifuge*, Judge Fox also noted that some courts are critical of using set factors to dismiss a case on bad faith grounds because "the filing of a chapter 11 case creates a bankruptcy estate for the benefit of creditors as well as the debtors." *Id.* (citing *In re Johns–Manville*, 36 B.R. at 737) ("The filing triggers the springing into existence of important constituencies which, along with the debtor, must be protected by a reorganization court"). Therefore, courts should be cautious in focusing too intently on a debtor's motives in filing for bankruptcy because the filing is as much for the benefit of creditors as it is for debtors'. *See id.*

7. As in the present case, *Clinton Centrifuge* involved a debtor whose financial status was threatened by claims successfully litigated against them in state court. *See id.* at 902, 908. The debtor in *Clinton Centrifuge* "had an ongoing business, with several employees and several creditors other than the movants." *Id.* Accordingly, Judge Fox concluded that there was no basis to find that the debtor's petition was filed in bad faith merely because such filing was triggered by state court proceedings adverse to the debtor. *See id.* In so ruling, Judge Fox stated that while reorganization would be difficult in light of the objections by the major creditors in that case, "the purpose of chapter 11 is to give the debtor that opportunity." *Id.*

Here, the Debtors claim to be operating their travel agency as an ongoing business, however, small, and this fact is not disputed by the Judgment Creditors. The Judgment Creditors merely argue that the business will not yield sufficient profits to aid in the Debtors' reorganization. While this constitutes evidence that reorganization may be futile, it is not sufficient evidence to support a finding of bad faith in the filing of the petition. The Court notes that cases cited by the Judgment Creditors finding bad faith in filing commonly involved debtors who were not operating as an ongoing business and thus the courts found these debtors had no intention of reorganizing. *See e.g., Cinema Service Corp. v. Edbee Corp.*, 774 F.2d 584, 584–86 (3d Cir. 1985) (debtor's sole asset was a movie theater scheduled for a sheriff's sale); *In re Newark Airport/Hotel Ltd. Partnership*, 156 B.R. 444, 448–49 (Bankr.D.N.J.1993) (found that filing was in good faith because debtor was operating an ongoing business); *Ravick*, 106 B.R. at 845 (debtor corporation was formed for sole purpose of dividing and developing property which was subject of foreclosure proceeding. The debtor "has no employees" except the sole officer, and shareholder, "no cash flow, and no source of income except for cash generated in dispersal of portions of the Property". "The debtor does not produce any goods or perform any services; it maintains no inventory, has no accounts receivable and it does not maintain financial statements").

udicial to the creditors. Additionally, the Debtors have already transferred all or substantially all of their property to the Judgment Creditors pursuant to the Escrow Agreement. As importantly the facts of this case reveal that the Debtors are, at this point in the case, unable to effectuate a plan or rehabilitate their business or financial affairs within a reasonable period of time.

According to the Debtors, their reorganization plan will be based, at least in part, on the possibility of recovering substantial sums of money in their malpractice action against their former attorneys. *See* Ziemke Certification, at ¶ 38. In addition, the Debtors' concede that the ultimate success of their proposed attempt at reorganization will rest on the extent and validity of the Judgment Creditors' lien pursuant to the state court ruling and the Escrow Agreement. *See id.*

Specifically, Ziemke states:

"The escrowed assets are essential to any plan that my mother and I would file. Such a plan would likely include the following elements:

a. Retaining the capital stock in ITAS and control of the business with payment to creditors to be made out of the ITAS cash flow.

b. A sharing arrangement in the net proceeds of any recovery in our pending legal malpractice action against our former trial counsel in the defamation suit. Annexed hereto as Exhibit "A" is a letter from special litigation counsel who we have retained to prosecute this action in which he very candidly gives his assessment of our case.

c. Keeping our house and reaffirming the first mortgage.

d. The actual form of the plan would be dependent upon whether the Almog/Geller liens are valid or not and the ultimate outcome of the nondischargeability adversary proceeding."

Ziemke Certification, at ¶ 38.

■ This Court finds no reason to disturb the state court judgment. " '[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.' " *First Jersey National Bank v. Brown*, 951 F.2d 564, 568 (3d Cir.1991) (*quoting Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984)). Here, a final order has been issued by the state court against the Debtors and the Debtors have exhausted the appellate process in challenging this order all the way to the United States Supreme Court. Collateral estoppel principles may prevent the Debtors from re-litigating in bankruptcy court issues that have already been argued and resolved in state court. *See Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 658 n. 11, 112 L.Ed.2d 755 (1991) ("collateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a)").

■ The Judgment Creditors argue in their Memorandum of Law in Response to Debtors' Cross–Motion to Reject Escrow Agreement as an Executory Contract that the Debtors' cross-motion is unrelated to the Judgment Creditors' motion to dismiss the petition or in the alternative for relief from the automatic stay, and procedurally improper. ("Judgment Creditors' Reply Mem., at p. 3"). In support of this position, the Judgment Creditors assert that the Debtors' cross-motion "bears no relationship to the question of whether the petition should be dismissed ... [and that there ·is no] relationship between the Cross–Motion and the alternative Motion for Relief from the stay." *Id.* at p. 3 (*citing* D.N.J. LBR 9013–1)(d) ("No motion shall be designated as a cross-motion unless it is related to the original motion."), and *Federal Deposit Insurance Corporation v. Modular Homes, Inc.*, 859 F.Supp. 117, 125 (D.N.J.1994).

Initially, the Court notes that since the Debtors, in furtherance of their reorganization efforts, seek the rejection of the Escrow Agreement, the Debtors' Cross–Motion is related to this Court's determination to dismiss or convert the Debtors' case or grant the Judgment Creditors relief from the automatic stay. In addition, the Court finds little similarity between the cross-motion of defendant in *Federal Deposit Insurance Corporation* which was based on an asserted failure of the plaintiff to comply with discovery pursuant to Rule 37 and deemed unrelated to a motion by plaintiff to dismiss defendant's affirmative defenses, *see* 859 F.Supp. at 125, and the within cross-motion which is based on Debtors' request to authorize the rejection of an alleged executory agreement.

 Nonetheless, the Court finds that the Escrow Agreement and Collateral Security Agreement may not be rejected by the Debtors' under § 365(a) of the Code.[8] In *Sharon Steel Corporation v. National Fuel Gas Distribution Corporation,* 872 F.2d 36 (3d Cir.1989), the Third Circuit noted that while the Bankruptcy Code does not expressly define what constitutes an executory contract, courts generally rely on the following definition:

"[An executory contract is] a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."

*Id.* at 39 (*quoting* Countryman, Executory Contracts in Bankruptcy, Part 1, 57 Minn. L.Rev. 439, 460 (1973) (additional citations omitted)).

 Here, the Escrow Agreement and Collateral Security Agreement may not fairly be characterized as executory agreements because the Judgment Creditors have performed their obligations such that the Debtors are now obligated to perform in full. An executory agreement "is characterized by reciprocal obligations continuing into the future." *Sharon Steel Corporation,* 872 F.2d at 39; *see also In re Murtishi,* 55 B.R. 564, 567 (Bkrtcy.N.D.Ill. 1985) ("If performance no longer remains due on either side at the time the petition is filed, neither the court nor the trustee is confronted with an executory contract that can be rejected in bankruptcy"). Although both agreements here contain promises and obligations continuing into the future, these promises and obligations are all the responsibility of the Debtors and/or the escrow agent and not the Judgment Creditors. See Judgment Creditors' Reply Memorandum, at p. 5, Def. s' Brief, at p. 25, and Ziemke Cert. at ¶¶ 39–40.

The Judgment Creditors fully performed under the Escrow Agreement by refraining from execution on the Debtors' assets while the Debtors appealed the state court judgment. At present, the Judgment Creditors, pre-petition, have demanded a turn over of the assets to the Escrow Agent to which they are entitled. See January 15, 1999 Affidavit of David Feinsilver, at ¶ 19. Thus, since there are no "reciprocal obligations continuing into the future," the Debtors are not excused

---

**8.** Section 365 of the Bankruptcy Code provides, in pertinent part:

(a) Except as provided in 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

. . . . .

(g) Except as provided in subsections (h)(2) and (j)(2) of this section, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—

(*1*) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, or 13 of this title, immediately before the date of the filing of the petition; . . .

11 U.S.C. § 365.

from having to perform under the terms of the Escrow Agreement. *See Sharon Steel Corporation,* 872 F.2d at 39–40; *see also In re Murtishi,* 55 B.R. at 567 (" 'Semantically, a contract executory in whole or in part could include the debtor or bankrupt's unperformed obligation under a contract fully performed by the other party,' but such a construction would permit a trustee to repudiate accrued obligations") (*quoting Matter of Chicago, Rock Island & Pac. R. Co.,* 604 F.2d 1002 (7th Cir.1979) (contract fully performed by non-debtor party is not executory merely because debtor has not performed and, thus, contract may not be rejected)).

In addition, the Judgment Creditors argue that this Court should find that the Escrow Agreement and Collateral Security Agreement are more than just contracts because they were entered into pursuant to Orders of the Superior Court of New Jersey. *See* Judgment Creditors' Memorandum Of Law In Response To Debtors' Cross–Motion To Reject Escrow Agreement As An Executory Contract, at p. 5. This Court has already determined that it will not disturb valid state court Orders. Therefore, this Court finds no need to address whether the entry into agreements pursuant to court orders make these agreements any more or less valid and binding upon the parties involved.

Alternatively, the Judgment Creditors assert that rejection of an executory agreement does not require the turn over of assets referenced in the agreement to the Debtor. *See id.* In support of this argument, the Judgment Creditors cite *In re Walnut Associates,* 145 B.R. 489 (Bankr.E.D.Pa.1992), in which Bankruptcy Judge David A. Scholl noted that "the only effect of rejection is that the executory contract at issue in not assumed and the non-debtor party thereto cannot make an administrative claim against the debtor's estate if the debtor fails to fulfill the obligations of a contract." That court further noted:

This is not to say that rejection has no effect. It does mean that the non-debtor party to the contract subject to rejection is limited in its claims for breach to the treatment accorded to a debtor's general unsecured creditors. See *Westbrook,* supra, 74 MINN.L.REV. at 252–55, 336. It also means that, unless specific performance is available to the non-debtor party under applicable state law, the debtor cannot be compelled to render its performances required under the contract. However, if state law does authorize specific performance under the rejected executory contract, it means that the non-debtor should be able to enforce the contract against the Debtor, irrespective of his rejection of it.

145 B.R. at 494 (*citing In re Drexel Burnham Lambert Group Inc.,* 138 B.R. 687, 703 (Bankr.S.D.N.Y.1992) ("Rejection merely frees the estate from the obligation to perform, it does not make the contract disappear")).

The Judgment Creditors urge that their debt will ultimately be determined to be nondischargeable. (*citing In Re Cohen,* 106 F.3d 52, 59 (3d Cir.1997), aff'd *Cohen v. Cruz,* 523 U.S. 213, 118 S.Ct. 1212, 1216, 140 L.Ed.2d 341 (1998)). This Court does not reach that issue in the context of these motions.

Nonetheless, the Court finds that the Debtors' proposal to have the assets in escrow used for reorganization purposes is not feasible. Significant obstacles would stand in the way of the Court confirming any plan which has as a substantial component the turnover of the escrowed assets.

The Court must also reject the feasibility of Debtors' proposal to use funds from the possible recovery of money in their malpractice action against their former attorneys. The extent of the judgment, if any, is unknown at this time and will be for some time as the action has only relatively recently been filed. Thus, the Debtors' prospects for reorganization are, at best, extenuated in the face of having ex-

hausted all avenues of appeal of the Judgment Creditors' judgment.

■■■ Therefore, notwithstanding the presence or absence of bad faith in the filing of the Chapter 11 petitions, this Court may either dismiss these cases or convert these cases to Chapter 7 proceedings on the grounds that reorganization is futile or impracticable.[9] As the United States Supreme Court has stated, "[h]owever honest in its efforts the debtor may be, and however, sincere its motives, the District Court is not bound to clog its docket with visionary or impracticable schemes for resuscitation." *Tennessee Publishing Co. v. American Nat'l Bank*, 299 U.S. 18, 22, 57 S.Ct. 85, 81 L.Ed. 13 (1936) (*as quoted in In re Brown*, 951 F.2d 564, 572 (3d Cir.1991)). "[T]here must be 'a reasonable possibility of a successful reorganization within a reasonable time.'" *United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 376, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (*as quoted in In re Brown*, 951 F.2d at 572). "'Courts usually require the debtor do more than manifest unsubstantiated hopes for a successful reorganization.'" *In re Brown*, 951 F.2d at 572 (*quoting In re Canal Place Ltd. Partnership*, 921 F.2d 569, 577 (5th Cir.1991)).

These cases have been on the Court's docket since October 1, 1997, when the Debtors first filed for bankruptcy under Chapter 11. In all this time the Debtors have failed to submit a feasible plan for reorganization that this Court could confirm within a reasonable time. In fact, the Debtors have moved before this Court for a further extension of their exclusive time to file a plan. Additionally, since the Judgment Creditors have demonstrated that they will reject any plan of reorganization, it is unlikely that a plan could be approved by the Court within a reasonable

time. The Judgment Creditors comprise the largest creditors in these cases. The remaining creditors as scheduled in the Debtors' respective petitions are: First Union Bank, holding a first mortgage and its brokerage subsidiary (the latter listed only in Celia Shar's petition) with respective scheduled secured claims of $390,000.00 and $100,590.27, Howard B. Goldberg, Esq., as escrow agent with a second mortgage in the sum of $810,000.00. The mortgagors are secured by real property at 18 Canoe Brook Drive, Livingston, New Jersey. The real property in which each Debtor asserts a one-third (⅓) interest is valued in the schedules with a current market value of $400,000.00. The petitions list unsecured creditors holding claims for legal services scheduled as follows: Christopher Langone, Esq., $70,-000.00; Connell, Foley & Geiser, $250,-000.00; H. Neil Broder, Esq., $150,000.00; Pederson & Haupt, $11,508.00; Seyfarth, Shaw, Fairweather & Geraldson, $250,-000.00; Starr, Davison, Gern & Rubin, $43,000.00. Celia Shar and Marilyn Ziemke are each scheduled in the other's petition with contribution claims in an "unknown" amount. (Exh. V and W, Feinsilver Aff.).

Subsequent to the bankruptcy filing, First Union moved for relief from the stay for the purposes of liquidating the brokerage account and applying the proceeds against the outstanding indebtedness. ITAS recently completed payments on the loan. (Ziemke Cert., ¶ 24).

Here, there is no showing that the Debtors' other creditors would be prejudiced by either converting these cases to a chapter 7 liquidation proceedings or dismissing these cases altogether. Additionally, none of the creditors involved in this case have

---

**9.** As the Court has previously stated, there is insufficient evidence currently before the Court to hold that the Debtors filed their petitions in bad faith. Therefore, there is no need for the Court to address at length the Debtors' argument that "'both objective futili-

ty and subjective bad faith'" must be shown to warrant dismissal on bad faith grounds. See Debtor's Brief, at pp. 5–9 *quoting Carolin Corp. v. Miller*, 886 F.2d 693, 701 (4th Cir. 1989).

filed an objection to conversion or dismissal of the case.

The Debtors admit that "[t]he actual form of the plan [will] be dependent upon whether the Almog/Geller liens are valid or not and the ultimate outcome of the nondischargeability adversary proceeding." Ziemke Certification, at ¶ 38.

Thus, while the debtors may argue that there is no danger of a continuing loss or diminution of the estate since the estate's assets are being held in escrow, it is clear that the Debtors are unable to effectuate a plan of reorganization within a reasonable period of time, pursuant to § 1112(b)(2). In addition, the undue delay by the Debtors in failing to propose a plan for reorganization is prejudicial to creditors warrants conversion or dismissal of these cases. See 11 U.S.C. § 1112(b)(3). Accordingly, the Court may dismiss or convert these cases to chapter 7 proceedings for "cause" under either 11 U.S.C. § 1112(b)(2) or (b)(3).

**Whether Dismissal Or Conversion To Chapter 7 Is More Appropriate Where Case Is Essentially A Two–Party Dispute, Parties Moving for Dismissal Represent Largest Secured Lien Holders And Other Creditors Do Not Object To Dismissal**

▇▇▇ Generally, where a debtor's reorganization effort involves essentially a two-party dispute that is resolvable in state court, dismissal for "cause" is warranted. *See e.g., In re Brandywine Associates, Limited,* 85 B.R. 626 (Bankr. M.D.Fla.1988). (Dismissal warranted where single asset debtor without direct employees or material unsecured creditors and with one secured creditor, sought to forestall foreclosure); *In re Randy Homes Corporation,* 86 B.R. 259 (Bankr.M.D.Fla. 1988) (Debtor, whose sole asset is an unde-veloped parcel of real property, generating no income and who had no employees or existing business operations and never made any attempts to develop the real property, filed petition to forestall state court foreclosure action); *In re Noco, Inc.,* 76 B.R. 839, 845 (Bankr.N.D.Fla.1987) (Court's dismissal of the bankruptcy petition grounded in part on finding that the debtors were "... clearly attempting to use the reorganization process to litigate non-bankruptcy issues and to avoid the burdens of a contract."); *Matter of Young,* 76 B.R. 376 (Bankr.D.Del.1987) (Dismissal warranted where the debtor filed a chapter 11 petition in an attempt to stop a court ordered award of specific performance). *In re Waldron,* 785 F.2d 936 (11th Cir.1986) (Solvent Chapter 13 debtors invoked the bankruptcy process to reject real estate option agreement to secure more profitable deal, and prevent creditor from seeking specific performance in state court); *In re Kujawa,* 224 B.R. 104, 108 (E.D.Mo.1998) (dismissal of involuntary Chapter 7 case was sufficiently supported by evidence that bankruptcy case was essentially a two-party dispute between alleged debtor and his former attorney).

The Court finds that since the Debtors' reorganization efforts are essentially a two-party dispute with the Judgment Creditors, dismissal rather than conversion to Chapter 7 is more appropriate in these cases. There is no reason for this Court to become involved in a dispute between the Judgment Creditors and the Debtors' as to the parties' respective rights under the Escrow and Collateral Security Agreements. Furthermore, the Court finds immaterial to the issues before this Court the additional "evidence" Marilyn Ziemke asserts was not addressed in the state court.[10] Indeed, Marilyn

---

**10.** Marilyn Ziemke states in her Certification that there was an additional witness, a "supplier," who the state court judge refused to allow to testify at the trial, presumably because the proffered testimony was to be done via a satellite connection to a video camera.
See Exhibit B annexed to Ziemke Cert., at p. 5. Marilyn Ziemke asserts that this witness would have testified that the allegations of defamation were completely false. *See id.* In addition, Marilyn Ziemke asserts that there were other witnesses at the trial who would

Ziemke's statements only make it that much more clear that this case is a two-party dispute between the Judgment Creditors and the Debtors.

As stated earlier, this Court must defer to the state court judgment. Even if this Court were not bound to uphold the state court judgment, the debtors' cases are still essentially a two-party dispute with the Judgment Creditors over the validity of their purported lien interests pursuant to the state court judgment. This Court is not the proper forum for such an action. Additionally, the Court notes that the only other creditors are attorneys who represented the Debtors in the state court action and First Union Bank and its brokerage subsidiary.

The Debtors are currently in the process of contesting certain of these attorneys' fees on the grounds that their assistance at trial was ineffective and even allegedly constituted malpractice. This Court is not the proper forum to litigate such claims. This Court also finds that awaiting resolution of the Debtors' claims against their former attorneys in a state

court forum would be unreasonable because the outcome is uncertain and could conceivably have no effect on the bankruptcy estates.

■■■ Since neither the Debtors' former attorneys nor First Union Bank will be prejudiced by the dismissal of these cases there is no reason for the Court to maintain jurisdiction. Therefore, since there is no possibility for the Debtors to reorganize within a reasonable time, an inability to effectuate a plan, and unreasonable delay prejudicial to creditors and there will be no prejudice to any of the Debtors' creditors by dismissal, the Court finds no reason to cloud its docket with these matters any further. See In re C–TC 9th Avenue Partnership, 113 F.3d 1304, 1309 (2d Cir. 1997) ("while a debtor may conclude Chapter 11 proceedings by liquidating and may even enter them with an intent to liquidate if necessary, there is no reason a debtor should be permitted to enter these proceedings without a possibility of reorganization"). Accordingly, the Debtors' cases are dismissed for "cause" pursuant to 11 U.S.C. § 1112(b)(2) and (b)(3).[11]

have testified that Debtors never made statements that the Judgement Creditors engaged in adultery. *See id.*

Marilyn Ziemke has attached a sworn affidavit of a Mr. Mark Ronen to her Certification in which Mr. Ronen affirms that Almog and Geller were part of a plan "to take over the ITAS business from the women [Debtors]." Mark Ronen Aff., annexed as Exhibit C to Ziemke Cert. This Court finds no reason to disturb the state trial court ruling by questioning its validity and makes no comment as to whether this Court even has such authority.

11. Generally, the dismissal of a bankruptcy petition results in the concomitant dismissal of all pending adversary proceedings. *In re Stardust Inn, Inc.*, 70 B.R. 888, 890 (Bankr. E.D.Pa.1987); *In re Pocklington*, 21 B.R. 199, 202 (Bankr.S.D.Cal.1982). This is particularly true of adversary proceedings which are "related" to the bankruptcy case pursuant to 28 U.S.C. § 157(c)(1), since the related proceeding can only be heard by a bankruptcy court because of its nexus to the debtor's bankruptcy case. *See Stardust Inn, supra*, 70 B.R. at 890. *See generally, Pacor v. Higgins*, 743 F.2d 984 (3d Cir.1984). *Cf. In re Lake Tahoe Land Co., Inc.*, 12 B.R. 479 (Bankr.

D.Nev.1981) (bankruptcy court maintained jurisdiction over adversary proceeding after underlying bankruptcy proceeding dismissed where the statute of limitations for creditor to file action to recover a deficiency judgment in state court lapsed). Accordingly, dismissal of the Chapter 11 bankruptcy petitions herein results in dismissal of Adversary Proceeding No. 98–2206 entitled *Shalom Almog, Irit Almog and Ben Amit Geller vs. Celia Shar and Marilyn Ziemke*. Complaint Objecting to Dischargeability of Certain debts under 11 U.S.C. § 523(a)(6).

In the case of *Matter of Solar Equipment Corp.*, 19 B.R. 1010 (W.D.La.1982) the District Court for the Western District of Louisiana held that, upon dismissal of the debtor's bankruptcy petition, the bankruptcy court relinquished subject matter jurisdiction to continue the automatic stay provisions of § 362, and to make a determination of the debtor's tax liability pursuant to § 505. This rationale applies with equal force to the Debtors' motion, filed December 31, 1998, to reject the Escrow Agreement pursuant to 11 U.S.C. § 365 and the Debtors' motion filed November 25, 1998 to further extend the Debtors'

In the alternative, relief from the automatic stay in favor of the Judgment Creditors for "cause" pursuant to 11 U.S.C. § 362(d) is certainly appropriate here. The Escrow Agreement is not an executory contract that the Debtors may reject. The Debtors are obligated to perform and turnover the assets in the Escrow Agreement to the Judgment Creditors and the Debtors have refused to do so. The Judgment Creditors should be allowed to pursue state court remedies against the Debtors.

Because the Court finds that there is insufficient evidence to conclude that the Debtors originally filed their petitions in bad faith, the Court denies the Judgment Creditors motion for sanctions.

An Order shall be submitted in accordance with this opinion.

exclusive periods to file plans of reorganization and obtain acceptances thereof pursuant to 11 U.S.C. § 1121(d). Accordingly, the Court having dismissed the Debtors' bankruptcy petitions, the Debtors' pending § 365 motion and § 1121(d) motion are rendered moot.